610 F.2d 629
 Gladys FISHER, on behalf of herself and all others similarly
situated, Plaintiff-Appellant,
v.
John R. REISER, Chairman of Nevada Industrial Commission, in
his official capacity; Claude Evans, Commissioner, Nevada
Industrial Commission; James S. Lorigan, Commissioner,
Nevada Industrial Commission; the Nevada Industrial
Commission; and Mike Mirabelli, State Treasurer of Nevada,
Defendants-Appellees.
 No. 77-2715.
 United States Court of Appeals,
Ninth Circuit.
 Nov. 28, 1979.
Rehearing Denied Jan. 2, 1980.
 
 Gill Deford, Los Angeles, Cal., argued, for plaintiff-appellant.
 J. M. Landish, F. King, Las Vegas, Nev., argued, for defendants-appellees.
 Appeal from the United States District Court for the District of Nevada.
 Before HUFSTEDLER and KENNEDY, Circuit Judges, and EAST,* District judge.
 KENNEDY, Circuit Judge:
 
 
 1
 This appeal presents us with a challenge to certain Nevada workers' compensation statutes and raises equal protection and right of travel issues. Nevada maintains a workers' compensation program for persons who sustain industrial injuries during their employment in Nevada. Compensation benefits are payable to injured employees and their survivors regardless of where they reside after the injury. In 1973 and in 1975, the Nevada Legislature granted cost-of-living increases to workers' compensation beneficiaries who continued to reside in Nevada, but it denied the increased benefits to the beneficiaries who were not Nevada residents. The district court rejected plaintiffs' constitutional challenge to these statutes, and we affirm.
 
 
 2
 Before addressing the background of the plaintiffs' case, we summarize the controlling statutes. Under the Nevada Industrial Insurance Act (Nev.Rev.Stat. § 616.010 Et seq. (1977)), Nevada employers must insure workers against the risk of industrial injuries. The Nevada Industrial Commission ("NIC") administers a state insurance fund, financed by employer premiums, which is used to pay workers' compensation benefits to injured workers. Employees injured in accidents "arising out of and in the course of employment" with a covered employer are entitled to certain benefits under the program.
 
 
 3
 To be eligible for benefits, the injured employee must have been working in Nevada for a covered employer at the time of the injury. Workers hired or regularly employed in Nevada are also eligible for benefits if they are injured while working for their employer temporarily outside the state. (Nev.Rev.Stat. § 616.520).[1] Workers hired outside Nevada are eligible for benefits unless they are only temporarily working in the state and are covered by another state's workers' compensation program. (Nev.Rev.Stat. § 616.260). Compensation benefits are payable to injured employees and their survivors wherever they may reside after the injury.[2]
 
 
 4
 The level of benefits available to the injured worker or to his survivors depends on the nature of the injury and the average wage of the worker at the time of the injury. Permanently and totally disabled workers are entitled to monthly payments of two-thirds of their average wage at the time of their injury, until their death. (Nev.Rev.Stat. § 616.580). The surviving spouse of an employee whose death was caused by a job-related accident is entitled to monthly payments of two-thirds of the employee's average wage at the time of the injury. Death benefits are paid until the surviving spouse dies or remarries. (Nev.Rev.Stat. § 616.615).
 
 
 5
 Because the benefits received are based on a percentage of wages earned by the covered worker at the date of the injury, compensation recipients have been particularly hurt by inflation. In 1973, the Legislature responded to the beneficiaries' plight by granting flat percentage increases in permanent total disability and death benefits, but the Legislature limited these cost-of-living increases to those beneficiaries who were living in Nevada. Death benefits based upon industrial injuries occurring before July 1, 1973, and permanent total disability benefits from injuries occurring before April 9, 1971, were increased by 10 percent. (Nev.Rev.Stat. §§ 616.628, 616.626). In 1975, the same benefit adjustment was increased to 20 percent, and the increase was likewise limited to Nevada residents only.[3] Limitation of the increases to residents only gives rise to the constitutional questions presented here.
 
 
 6
 The NIC was reimbursed from general estate funds for the cost of the initial 10 percent cost-of-living increase in disability and death benefit pensions. When the cost-of-living supplement was increased to 20 percent in 1975, the Legislature directed that the increase be paid from a newly-created silicosis and disabled pension fund. The latter fund was established by an appropriation from general revenues when the Legislature extended workers' compensation to persons injured by exposure to silicon dioxide dust. (Nev.Rev.Stat. §§ 617.323, 617.460). The fund is used to reimburse NIC for payment of silicosis claims and for the cost-of-living supplements in disability and death benefit cases.
 
 
 7
 Although eligibility for disability and death benefits is based upon industrial injury in Nevada, without regard to the residence of the injured employee or his survivors, the cost-of-living increases to the beneficiaries are provided only to those recipients who remain residents of Nevada. As of February 1, 1977, the NIC was administering 583 pensions that qualified for the 20 percent cost-of-living increases. Recipients of 363 of those pensions were receiving the 20 percent supplement because they were still residing in Nevada. The recipients of 220 pensions were not receiving the same income supplements solely because they resided outside Nevada.
 
 
 8
 Gladys Fisher is a recipient of one of the 220 pensions that were not supplemented. She is an 80 year old widow who lives in Applegate, California. She and her deceased husband, Charles, formerly lived in Las Vegas, Nevada, where he was employed in the city metal shop. On September 25, 1962, he suffered severe brain damage in a work-related accident that left him totally disabled. Mr. Fisher qualified for the receipt of permanent total disability benefits under the Nevada compensation scheme. He began receiving disability benefits effective from the date of his injury.
 
 
 9
 In March, 1963, Mr. and Mrs. Fisher moved to California, where their children could help Mrs. Fisher care for Mr. Fisher. After they settled in California, the Fishers continued to receive monthly disability benefit payments from the NIC. On May 10, 1972, Mr. Fisher died. Although the disability benefits terminated on Mr. Fisher's death, Mrs. Fisher became eligible for death benefits under the Nevada compensation program because her husband's death resulted from the injuries he sustained in a covered accident. (Nev.Rev.Stat. § 616.615). She began receiving monthly benefits of $167.50, one-half of her husband's average wage at the time of his injury.[4]
 
 
 10
 Apart from her monthly benefits from the NIC, Mrs. Fisher's only other source of income has been a Social Security payment of $178.30 per month. She has had great difficulty living on her meager income. When she learned that Nevada had approved cost-of-living increases in compensation benefits, she wrote to the NIC and explained her circumstances. Although the Commission expressed sympathy for Mrs. Fisher, the Commission informed her that the 20 percent cost-of-living supplements were paid only to persons residing in Nevada. She was told that if she moved back to Nevada, her monthly benefits would be increased by 20 percent, but, so long as she resided outside Nevada, she could never receive more than her $167.50 monthly benefit.
 
 
 11
 When a program of free legal services for the elderly was initiated in her community, Mrs. Fisher saw a lawyer about her problem. Thereafter, a class action was filed on her behalf and on behalf of those similarly situated against the Commissioners of the NIC and the Nevada State Treasurer. Invoking federal jurisdiction under 42 U.S.C. § 1983, the action sought declaratory and injunctive relief to redress alleged deprivations of equal protection and the right to travel based upon Nevada's denial of cost-of-living increases to those beneficiaries who were residing outside Nevada.
 
 
 12
 The district court certified a class consisting of all recipients of permanent total disability and death benefit pensions under the Nevada program who did not receive cost-of-living increases solely because they resided outside Nevada. The case was tried on stipulated facts, and judgment was entered for the defendants. The district court refused to apply strict scrutiny to the Nevada program because it did not perceive any infringement of the constitutional right to travel. The district court held that the Nevada scheme involved a simple residency requirement that, unlike durational residency requirements, fell outside the purview of the right to travel. The Nevada program survived the equal protection challenge because the district court held that the eligibility limitation was rationally related to Nevada's legitimate interests in protecting the health and welfare of its own citizens while limiting the state's general revenue expenditures. We turn now to the legal issues in the case.
 
 
 13
 The appellants' constitutional premise is that the Nevada statutory classification must be subject to strict scrutiny because it penalizes their right to travel, as did the classifications in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); and Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). We do not agree. We conclude the appellants' right to travel was not penalized, and thus strict scrutiny of Nevada's statutory classification is not required. The cases cited by appellants do not support the proposition that a classification based upon residence is subject to strict scrutiny when attacked by one who has migrated from the state which denies the benefit in question.
 
 
 14
 In Shapiro, Dunn, and Maricopa County, the issue involved the obligation and responsibility of the claimant's new state of residence; here the claimants seek to enforce an obligation against the state of former residence. The distinction is critical. Any primary obligation to ascertain a citizen's economic status or condition and to make provision for his or her well being falls upon the state of current residence, not the state where the citizen formerly resided. It is a fact of our federal system that a state is limited both in its competence and its responsibility to exercising its welfare powers for those persons who are its residents, and, perhaps in some cases, those temporarily within its borders. We find no authority for the broad proposition that Nevada must pass prospective legislation with reference to the subsistence or economic well being of persons formerly residing in it but who are now resident elsewhere, or include former residents in statutes passed to aid current residents.[5] In Shapiro, Dunn, and Maricopa County, on the other hand, the state with whom the claimant had a new and existing political relation refused to recognize that status without the imposition of a durational waiting period. That period discriminated against those who had recently exercised their right of interstate migration. As stated in the Maricopa County case:
 
 
 15
 (T)he right of interstate travel must be seen as insuring new residents the same right to vital government benefits and privileges in the States to which they migrate as are enjoyed by other residents.
 
 
 16
 415 U.S. 250 at 261, 94 S.Ct. 1076 at 1084, 39 L.Ed.2d 306.
 
 
 17
 Califano v. Torres, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978), makes it abundantly clear that the obligation imposed on the states under Shapiro and Maricopa County, the obligation to grant immediate or reasonably prompt recognition to a newly arrived citizen, cannot be the basis for automatically imposing a reverse obligation on the former state to continue to care for the former resident. In Torres, various old age and disability benefits under the Supplemental Security Income Act were payable only while the claimant resided in one of the fifty states. The claimant moved to Puerto Rico. The court acknowledged that the denial of benefits resulted from the claimant's exercise of a constitutionally protected right of travel and that the claimant was prejudiced, since benefits under equivalent programs for which she might qualify were significantly less. The Court upheld as lawful the benefit termination. After referring to Shapiro and Maricopa County the court stated:
 
 
 18
 In the present cases the District Court altogether transposed that proposition. It held that the Constitution requires that a person who travels to Puerto Rico must be given benefits superior to those enjoyed by other residents of Puerto Rico if the newcomer enjoyed those benefits in the State from which he came. This Court has never held that the constitutional right to travel embraces any such doctrine, and we decline to do so now. Such a doctrine would apply with equal force to any benefits a State might provide for its residents, and would require a State to continue to pay those benefits indefinitely to any persons who had once resided there. And the broader implications of such a doctrine in other areas of substantive law would bid fair to destroy the independent power of each State under our Constitution to enact laws uniformly applicable to all of its residents.
 
 435 U.S. at 4-5, 98 S.Ct. at 908.[6]
 
 19
 While we are not prepared to say that a state may never be held to have some continuing duties to a former resident, we do not think such obligations can be measured automatically by the standards set forth in Shapiro and Maricopa County, even assuming the claims asserted here were in all respects comparable.[7] To do so would be inconsistent with state jurisdictional limitations based on territorial boundaries and the concept of residence, jurisdictional limitations that are a principal feature of our federal system. We are reluctant to impose upon states fiscal burdens that are not coterminous either with their taxing power or their general jurisdiction.
 
 
 20
 It is true that given the pattern of existing state legislation, a welfare recipient who migrates to a new state is more likely to receive welfare benefits in the new state than is a recipient of Nevada workers' compensation residing in California likely to receive a cost-of-living increase from the California legislature (or the legislatures of any other states). This fact seems to us of no significance for right to travel analysis. As we understand the Court's precedents, whether a residency or other requirement employed by a state infringes the right to travel does not depend on what benefits other states choose to provide. For some kinds of monetary benefit programs for which a residency requirement would be constitutional, a state is not required to, and may not in fact, provide any program at all. Losing such benefits upon migration from a state which does provide them does not thereby mean the right to travel has been infringed.
 
 
 21
 Other distinctions between this case and the three authorities principally relied upon by the appellant have a significant bearing upon our decision. In Shapiro, Dunn, and Maricopa County, the challenged classification was a one year durational residency requirement, not a simple residency requirement. The Court in Dunn was careful to note that it was the durational aspect which implicated right to travel concerns.[8] In a later case, the Court sustained a continuing residency requirement as a condition for municipal employment. McCarthy v. Philadelphia Civil Service Commission, 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 (1976). The Court emphasized the distinction between durational residency requirements and a bare residency requirement such as the one facing us here:
 
 
 22
 We have previously differentiated between a requirement of continuing residency and a requirement of prior residency of a given duration. Thus in Shapiro, supra, (394 U.S.) at 636 (, 89 S.Ct. 1322), we stated: "The residence requirement and the one-year waiting-period requirement are distinct and independent prerequisites." And in Memorial Hospital, supra, (415 U.S.) at 255 (, 94 S.Ct. at 1081, 39 L.Ed.2d at 313,) quoting Dunn, supra (405 U.S.) at 342 n. 13 (, 92 S.Ct. 995), the Court explained that Shapiro and Dunn did not question " 'the validity of appropriately defined and uniformly applied bona fide residence requirements.' "
 
 
 23
 Id. at 647, 96 S.Ct. at 1155.
 
 
 24
 A further distinction between the cases invalidating durational residency classifications and the facts of the instant case is in the nature of the benefit denied. In Shapiro the claim was for subsistence welfare; in Dunn the denial was of the fundamental right to vote; and in Maricopa County the injury was the loss of the right to free nonemergency medical treatment. The Court in Maricopa County emphasized that the fundamental character of the claims asserted in the three cases was a factor in finding that the right to travel had been penalized:
 
 
 25
 In Dunn v. Blumstein, supra, the Court found that the denial of the franchise, "a fundamental political right," Reynolds v. Sims, 377 U.S. 533, 562 (, 84 S.Ct. 1362, 12 L.Ed.2d 506) (1964), was a penalty requiring application of the compelling-state-interest test. In Shapiro, the Court found denial of the basic "necessities of life" to be a penalty. Nonetheless, the Court has declined to strike down state statutes requiring one year of residence as a condition to lower tuition at state institutions of higher education.
 
 
 26
 Whatever the ultimate parameters of the Shapiro penalty analysis, it is at least clear that medical care is as much "a basic necessity of life" to an indigent as welfare assistance. And, governmental privileges or benefits necessary to basic sustenance have often been viewed as being of greater constitutional significance than less essential forms of governmental entitlements. See, e. g., Shapiro, supra; Goldberg v. Kelly, 397 U.S. 254, 264 (90 S.Ct. 1011, 25 L.Ed.2d 287) (1970); Sniadach v. Family Finance Corp., 395 U.S. 337 (, 89 S.Ct. 1820, 23 L.Ed.2d 349) 340-342 (1969).
 
 
 27
 415 U.S. at 259, 94 S.Ct. at 1082-1083 (citations omitted). The benefit in question here is a supplemental payment for spousal disability. Eligibility for the benefit is not based upon financial need. We cannot say that such benefits have a necessity or urgency as great as the benefits in Shapiro or Maricopa County. The Supreme Court has specifically held that where eligibility for benefits is not based upon financial need, termination of the benefit does not implicate the same constitutional concerns that denial of the benefit for basic subsistence does. Mathews v. Eldridge, 424 U.S. 319, 340-43, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
 
 
 28
 In summary, when we contrast the claim presented here with that of the three principal Supreme Court cases discussing withholding of rights or benefits as a result of interstate migration, we find that the absence of a political or residential relation between the claimant and the state, the absence of a durational residency requirement, and the fact that eligibility is not based upon need are all factors which detract from the strength of the claim to such an extent that the statutory classification does not burden the right of travel in a manner requiring strict scrutiny.
 
 
 29
 We turn next to the claim that the statutory classification between residents and nonresidents for determining eligibility to receive the supplemental benefit violates the equal protection clause, even if no right to travel concerns are implicated. We are mindful that the provision in question is the kind which requires a high degree of judicial deference. See, e. g., Mathews v. De Castro, 429 U.S. 181, 185, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976); Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). As the Court said in Califano v. Torres :
 
 
 30
 (A) law providing for governmental payments of monetary benefits . . . "is entitled to a strong presumption of constitutionality." Mathews v. De Castro, 429 U.S. 181, 185 (, 97 S.Ct. 431, 50 L.Ed.2d 389) (1976). "So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straitjacket." Jefferson v. Hackney, 406 U.S. 535, 546 (, 92 S.Ct. 1724, 32 L.Ed.2d 285) (1972). See also Califano v. Jobst, 434 U.S. 47, 53-54 (, 98 S.Ct. 95, 54 L.Ed.2d 228); Califano v. Goldfarb, 430 U.S. 199, 210 (, 97 S.Ct. 1021, 51 L.Ed.2d 270) (1977); Helvering v. Davis, 301 U.S. 619, 640 (, 57 S.Ct. 904, 81 L.Ed. 1307) (1937).
 
 
 31
 435 U.S. at 5, 98 S.Ct. at 908. The Court elaborated in Califano v. Aznavorian, 439 U.S. 170, 174, 99 S.Ct. 471, 474, 58 L.Ed.2d 435 (1978):
 
 
 32
 "Social welfare legislation, by its very nature, involves drawing lines among categories of people, lines that necessarily are sometimes arbitrary. This Court has consistently upheld the constitutionality of such classifications in federal welfare legislation where a rational basis existed for Congress's choice."
 
 
 33
 We recognize that the supplemental benefits sought by Mrs. Fisher are important to her and others similarly situated. We assume that for her, payment or nonpayment of the claim will result in a different standard of living. We find, however, that the challenged classification meets the constitutional test of rationality.
 
 
 34
 From the group of workers' compensation beneficiaries, the statute identified a subclass consisting of Nevada residents. The inflationary supplement was limited to the subclass. That this group was treated as a discrete entity is apparent from the funding provisions made for the supplemental benefits. The basic industrial insurance benefits, available to residents and nonresidents alike, were paid from an insurance fund established and maintained by Nevada employers, with a fixed schedule of benefits. See page 631, Supra. The subsequent, distinct Nevada legislative action to grant a cost-of-living increase to the subclass of residents was payable not from this insurance fund but from general funds of the State of Nevada. Nev.Rev.Stat. §§ 616.626, 616.628.
 
 
 35
 Nevada has a legitimate interest in confining payments to those most likely to spend it within the territorial limits of the state. Califano v. Aznavorian, 439 U.S. 170, 178, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978). Similarly, the legislature rationally may have concluded that it was more familiar with the needs of in-state recipients of workers compensation. See id. There may be additional factors supporting the decision, including the costs of administering the payments for, and ascertaining eligibility of, out-of-state residents. The challenged classification rationally furthers all these legitimate state interests.
 
 
 36
 No doubt one object of the Nevada legislation was to prove increased assistance to workers' compensation beneficiaries, and, we must concede, by adopting a residency classification the legislature did not fully implement this purpose. As is true in many such programs, See, e. g., Califano v. Jobst, 434 U.S. 47, 50-53, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977), the legislature has not pursued this goal with single-minded consistency. See also Sims v. Harris, 607 F.2d 1253 (9th Cir. 1979). Congress need not, however, be guided only by the objective of the original worker's compensation program. The cost-of-living statute is a separate enactment which may be informed both by the purpose of the first compensation program and also by other legitimate legislative policies. Those policies suffice to sustain the Act as rational and within the constitutional powers of the State of Nevada.
 
 
 37
 For the foregoing reasons, the judgment is AFFIRMED.
 
 HUFSTEDLER, Circuit Judge, dissenting:
 
 38
 The novel question presented on this appeal is whether Nevada's denial of cost-of-living increases to workers' compensation beneficiaries solely because those beneficiaries have left the state infringes the non-resident beneficiaries' constitutionally-protected right to travel. The majority says that these benefits are no different from welfare benefits for which a requirement of present residency may be constitutionally imposed. Because this characterization is fundamentally at odds with the very nature of these compensation benefits, a requirement of present residency for those benefits unconstitutionally interferes with the petitioners' right to travel.
 
 
 39
 The Constitution imposes no obligation on the state of Nevada to provide the cost-of-living increases for disability and death benefit pensions. However, when Nevada decided to alleviate some of the hardships of inflation by providing those increases, "the manner in which it dispenses benefits is subject to constitutional limitations." (Maher v. Roe (1977) 432 U.S. 464, 470, 97 S.Ct. 2376, 2380, 53 L.Ed.2d 484.) Fisher argues that Nevada must accord equal treatment to residents and non-residents who are recipients of disability and death benefit pensions.
 
 
 40
 The threshold inquiry in the equal protection analysis is whether Nevada's classification of pension beneficiaries "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution." (San Antonio School Dist. v. Rodriguez (1973) 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16.) If the Nevada classification either disadvantages a suspect class or impinges on a fundamental right, then Nevada must demonstrate that the classification is "necessary to promote a Compelling governmental interest." (Shapiro v. Thompson (1969) 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600.) If the classification neither disadvantages a suspect class nor impinges upon a fundamental right, Nevada can successfully defend the classification if it is rationally related to a legitimate state interest.
 
 
 41
 Although the right to travel is not explicitly mentioned in the Constitution, it is a fundamental right implicitly given constitutional protection.[1] Strict scrutiny must be applied to the Nevada scheme if it impinges on the pensioner's right to travel. Beginning with Shapiro v. Thompson, supra, 394 U.S. 618, 89 S.Ct. 1322, the Court began defining the contours of the fundamental right to interstate travel recognized in United States v. Guest (1966) 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239. Shapiro struck down one-year residency requirements for state welfare benefits because the residency requirements penalized the exercise of the constitutional right to travel. The Court explained:
 
 
 42
 The waiting-period provision denies welfare benefits to otherwise eligible applicants solely because they have recently moved into the jurisdiction. But in moving from State to State or to the District of Columbia appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a Compelling governmental interest, is unconstitutional.
 
 
 43
 (394 U.S. at 634, 89 S.Ct. at 1331.)[2]
 
 
 44
 In Dunn v. Blumstein (1972) 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274, the Court invalidated a one-year residency requirement for voting in state elections as an infringement of the right to travel. The Court expressly rejected the idea that Shapiro applied only to residency requirements enacted for the purpose of deterring travel; it also rejected the notion that a deterrent effect on travel had to be demonstrated before a residency requirement could be struck down. (405 U.S. at 399-40, 92 S.Ct. 995). The compelling state interest test is "triggered by 'any classification which serves to Penalize the exercise of that right (to travel) . . .' " (405 U.S. at 340, 92 S.Ct. at 1002.)[3]
 
 
 45
 In Memorial Hospital v. Maricopa County (1974) 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306, the Court added some refinements to Shapiro and Dunn in the course of invalidating a requirement that indigents reside in a county for one year before they became eligible for free non-emergency medical care. The Court said that the right to travel as involved in these cases meant "the right to migrate, 'with intent to settle and abide.' " (415 U.S. at 255, 94 S.Ct. at 1080.)[4] The Court also indicated that the "penalty" required to invoke strict scrutiny involves a genuinely significant deprivation, such as a denial of the basic "necessities of life" (as in Shapiro ), or the denial of a "fundamental political right" (as in Dunn ).[5]
 
 
 46
 This Nevada classification penalizes only those persons who choose to leave Nevada for residence in another state. Eligibility for the basic pension is no based on residence; it is based only upon an industrial accident occurring in Nevada.[6] Nevada's decision to limit disability and death benefit pensions to those injured in industrial accidents is unchallenged. The challenged classification is the sub-classification that Nevada has applied in providing cost-of-living increases: the distinction between those class members who continue to reside in Nevada, who receive cost-of-living increases, and those who have moved out of the state, who do not. The sub-classification penalizes those pensioners, and only those pensioners, who have exercised their right of interstate travel by migrating to another state.[7]
 
 
 47
 Like the residency requirements invalidated in Shapiro, the Nevada scheme penalizes migration rather than movement. The migration wrinkle in this case is that Fisher's class is penalized by the state From which they have migrated, rather than the one to which they have moved, as in Shapiro, Dunn, and Memorial Hospital.[8] That distinction has no constitutional significance because interstate travel is not a one-way road. (See, e. g., Crandall v. Nevada (1867) 6 Wall. (73 U.S.) 35, 18 L.Ed. 744; United States v. Guest, supra, 383 U.S. at 757-58, 86 S.Ct. 1170, 16 L.Ed.2d 239; In re King (1970) 3 Cal.3d 226, 90 Cal.Rptr. 15, 474 P.2d 983 (statute imposing greater criminal penalties for non-support on migration from the state violates equal protection clause.)
 
 
 48
 The majority recognizes that it is the "durational aspect" of a residency requirement that most seriously implicates right to travel concerns.[9] A durational requirement occurs when a person is effectively required to have resided in a state at two distinct points in time in order to obtain a benefit. That case is presented today, since the beneficiaries are effectively required to have resided in the state at the time of their accident and at present. In previous cases the Supreme Court has struck down the requirement of prior residency. The majority today recognizes that prior connection with the state (past employment) is the essential nexus of this particular kind of benefit, but it is nevertheless reluctant to strike down the requirement of present residency. Yet that requirement is no more relevant to the state's interest in providing the benefit in this case than prior residency was to the state's interest in the previous cases.
 
 
 49
 Eligibility for benefits "always has been understood to be tied to an individual's identification with a particular State." (Baldwin v. Montana Fish & Game Comm'n (1978) 436 U.S. 371, 383, 98 S.Ct. 1852, 1860, 56 L.Ed.2d 354.) A state does not penalize interstate migration by denying welfare, the right to vote, the right to municipal employment, or the right to free non-emergency medical care to persons who are not bona fide state residents because residence is the nexus of eligibility for consideration for all of these benefits. Once a person migrates to another state, he or she then becomes eligible to vote and obtain state services in his or her new state of residence.[10] Workers' compensation benefits, however, are different from these state services because the nexus of eligibility is not present residence but past employment in the state. In this sense, they resemble unemployment compensation schemes. (Cf. Shapiro v. Thompson, supra, 394 U.S. at 633 n.10, 89 S.Ct. 1322 (nexus of eligibility for state insurance program benefits (contributions) is different from nexus of eligibility for welfare (state citizenship)).) Disability and death benefit pensions are designed to compensate injured workers and their survivors for their loss of earning power caused by industrial injuries. Once an individual has been injured in a job-related accident with a covered Nevada employer, he is eligible for Nevada's workers' compensation benefits. Regardless of where the pensioner may thereafter move, he is entitled to receive those compensation benefits because of the injury he sustained while contributing to the Nevada labor force.
 
 
 50
 The majority asserts that "(a)ny primary obligation to ascertain a citizen's economic status or condition and to make provision for his or her well being falls upon the state of current residence, not the state where the citizen formerly resided." This is undoubtedly true, but it is emphatically not the case before this court. Rather, this case involves a specific type of benefit for which, both in accordance with overwhelming practice and the specific requirements of the basic program involved in this case, the responsibility falls upon the state where the beneficiary formerly worked. Nevada is indeed under no obligation to provide such benefits, but if it chooses to do so, it cannot provide them with Additional requirements of eligibility which infringe upon the right to travel. The undisputed significant connection of the beneficiaries to the state providing the benefit is in this context a past connection, not a present connection. In those specific circumstances, to require a present connection as well unduly penalizes plaintiff's constitutional right to travel.
 
 
 51
 The Nevada defendants, like the majority, respond that the cost-of-living increases are in the nature of welfare-type programs rather than workers' compensation, the program that is supplemented. They argue that the supplementary payments are actually a separate program of "tax supported benefits for needy residents." Nevada may have been more interested in helping their residents rather than non-residents, but the Nevada defendants cannot escape the fact that basic eligibility is not founded upon present residence, but upon past employment and injury in the state. The parties stipulated that the increases were enacted "(i)n order to provide approximately the same total benefits to those receiving (compensation for past injuries) . . . as to those receiving compensation for injuries occurring after the (fixed benefit levels were increased)." The fact that Nevada chose to finance the increases from general revenues does not mean that pensioners who have left Nevada may be excluded from the program without penalizing their right to travel. Moreover, the argument overlooks the fact that recent extensions of Nevada's workers' compensation (such as compensation for workers contracting silicosis while working in Nevada) have been funded from general revenues (Nev.Rev.Stat. § 617.325), yet these newer programs remain part of a workers' compensation program because eligibility is based on industrial injury within the state. The method that the state chooses to finance payment of workers' benefits does not mean that the state may discriminate against eligible workers solely because they exercise their right to travel.[11]
 
 
 52
 The Nevada program thus differs from the Supplemental Security Income program involved in Califano v. Torres (1978) 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65, because the Nevada program requires a distinctive past connection with the state industrial injury in Nevada as well as continued residency before a person can be eligible for a cost-of-living increase. In Torres, the Court held that the right to travel was not infringed by the failure to extend Supplemental Security Income benefits to persons residing in Puerto Rico. The nexus of eligibility for benefits in Torres was current residence, rather than any specific past connection with a particular state, such as industrial injury. Thus, although persons moving to Puerto Rico no longer continued to receive SSI benefits, Puerto Ricans who migrated to the States could become eligible for such benefits without having had any previous connection with their new state of residence. (42 U.S.C. §§ 1381 Et seq. (1974).) The Torres program was a welfare-type scheme that could be legitimately restricted to residents of a particular state. And unlike the situation in Torres, extension of the cost-of-living increases to workers' compensation pensioners residing outside the state would not provide non-resident beneficiaries with benefits superior to those enjoyed by other residents of either Nevada or of the states to which they migrated.[12]
 
 
 53
 Contrary to the majority's assertion, the denial of cost-of-living increases to Fisher's class does impose a significant penalty, under Memorial Hospital, on the exercise of the right to travel. Because the level of benefits is significantly less than the average wage loss, pensioners like Mrs. Fisher are typically in precarious financial circumstances. As a result of the rapid increase in the cost of living, the 20 percent increase in benefit levels has become essential to many pensioners to maintain even a bare subsistence. The Fisher pensioners, therefore, have suffered at least as great, and in many respects a greater penalty, than those persons who were denied non-emergency medical care in Memorial Hospital v. Maricopa County, supra, or those who were required to wait for long periods before public housing eligibility in King v. New Rochelle Municipal Housing Authority (2d Cir. 1971) 442 F.2d 646, and Cole v. Housing Authority of Newport (1st Cir. 1970) 435 F.2d 807. By virtue of the denial to Mrs. Fisher and her class of the cost-of-living increases, they have lost "aid upon which may depend the ability . . . to obtain the very means to subsist food, shelter, and other necessities of life." (Shapiro v. Thompson, supra, 394 U.S. at 627, 89 S.Ct. at 1327.)[13] Persons faced with the prospect of losing these benefits "will doubtless hesitate" before migrating. (Id. at 629, 89 S.Ct. 1322.)
 
 
 54
 Because Nevada's allocation of cost-of-living increases in disability and death benefits penalizes the exercise of the right to travel, it cannot withstand a constitutional attack unless the deprivation is shown to be "necessary to promote a Compelling governmental interest." (Shapiro v. Thompson, supra, 394 U.S. at 634, 89 S.Ct. at 1331.) The Nevada defendants have never argued that Nevada's program could satisfy a compelling state interest test. In fact, the only justification offered for the distinction between resident and non-resident beneficiaries is that "(t)he state is simply trying to make life better for an identifiable group of its own residents," while conserving state funds. Although Nevada "has a valid interest in preserving the fiscal integrity of its programs," it "may not accomplish such a purpose by invidious distinctions . . ." (Id. at 633, 89 S.Ct. at 1330; Memorial Hospital v. Maricopa County, supra, 415 U.S. at 263, 94 S.Ct. 1076.) Because the sole basis for distinguishing the two sub-classes of pensioners is out-of-state migration, that constitutional burden cannot be justified by a state's interest in saving money. Nevada did not have to provide any increases in disability and death benefits, but when it chose to do so it could not discriminate against individuals because they have exercised their right to travel.
 
 
 55
 Nevada's scheme of allocating cost-of-living increases only to pensioners residing in Nevada penalizes the right to travel without promoting a compelling state interest, and thus Mrs. Fisher and her class have been denied the equal protection of the law. I would accordingly reverse the judgment of the lower court, and remand this case for further proceedings consistent with the views herein expressed.
 
 
 
 *
 Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 Only workers injured within six months after leaving Nevada are covered by Section 616.520 of the Nevada Industrial Insurance Act, unless their Nevada employer notifies the NIC prior to expiration of the six-month period that he has elected to extend coverage for a greater period of time
 
 
 [2]
 The Legislature also increased the level of benefits to which workers subsequently injured would become entitled. This increase was financed by increasing employer premiums paid into the state insurance fund
 
 
 [3]
 Section 616.626 of the Nevada Industrial Insurance Act provides in pertinent part: "Any claimant or his dependents, Residing in this state, who receive compensation for permanent total disability on account of an industrial injury or disablement due to occupational disease occurring prior to April 9, 1971, is entitled to a 20 percent increase in such compensation, without regard to any wage limitation imposed by this chapter on the amount of such compensation." (emphasis supplied). Section 616.628 of the Nevada Industrial Insurance Act provides in pertinent part: "Any widow, widower, surviving children or surviving dependent parent or parents, Residing in this state, who receive death benefits on account of an industrial injury or disablement due to occupational disease occurring prior to July 1, 1973, is entitled to a 20 percent increase in such benefits without regard to any wage limitation imposed by this chapter on the amount of such benefits." (emphasis supplied)
 
 
 [4]
 Mrs. Fisher receives death benefits equal to only one-half of her husband's average wage because her husband was injured prior to the date when death benefit levels were increased to two-thirds of the deceased employee's average wage. (Nev.Rev.Stat. § 616.615)
 
 
 [5]
 Califano v. Torres, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978), discussed in the text, appears to be the authority most closely on point. In Ruiz v. Morton, 462 F.2d 818 (9th Cir. 1972), Aff'd and remanded on other grounds, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), the court did not reach a somewhat similar constitutional question. Judge Merrill in dissent, however, indicated agreement with the principles we state today. See id. at 825-26
 
 
 [6]
 Torres is factually distinguishable in that in addition to the residency requirement for receipt of SSI funds there was no requirement that a recipient have become blind or disabled in the United States instead of Puerto Rico. For purposes of evaluating the residency requirement in this case, however, the distinction is irrelevant. Assuming, moreover, that the requirement described above rationally furthered a legitimate government interest, we think the right-to-travel holding of Torres would have been the same had the challenged SSI provisions contained both requirements
 
 
 [7]
 United States v. Guest, 383 U.S. 745, 757-60, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239 (1966), which reaffirmed the "constitutional right to travel from one State to another" and "to use the highways and other instrumentalities of interstate commerce in doing so," and Crandall v. Nevada, 6 Wall. (73 U.S.) 35, 18 L.Ed. 744 (1867), which invalidated a Nevada tax on every person leaving the state by common carrier, provide no support for the proposition that statutes withdrawing benefits upon migration from a state must be judged under the same standards as statutes denying benefits to those who are new residents in a state
 
 
 [8]
 The Court has left open the possibility that some simple residency requirements, as well as durational residency requirements, might impermissibly burden the right to travel. See, e. g., Shapiro v. Thompson, 394 U.S. Supra at 638 n. 21, 89 S.Ct. 1322. The Court has emphasized, however, that simple residency requirements stand on a different footing than durational residency requirements. Dunn v. Blumstein, supra at 405 U.S. 342-44, 92 S.Ct. 995; McCarthy v. Philadelphia Civil Service Commission, supra
 
 
 [1]
 In United States v. Guest (1966) 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239, the Supreme Court held that the right to travel was one of the few individual rights that the Constitution protects against private interference. The Court observed: "The constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce in doing so, occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized." (383 U.S. at 757, 86 S.Ct. at 1178). The source of this constitutional right to travel has not, however, been precisely determined. In Guest, the Supreme Court observed that "(a)lthough the Articles of Confederation provided that 'the people of each State shall have free ingress and regress to and from any other State,' that right finds no explicit mention in the Constitution. The reason, it has been suggested, is that a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created." (383 U.S. at 758, 86 S.Ct. at 1178 (footnotes omitted).) In Shapiro v. Thompson (1969) 394 U.S. 618, 630, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600, the Supreme Court stated that it had "no occasion to ascribe the source of this right to travel interstate to a particular constitutional provision." The Court noted that previous decisions involving the right to travel had variously grounded it on the Privileges and Immunities Clause of Art. IV, § 2, the Privileges and Immunities Clause of the Fourteenth Amendment, the Commerce Clause, and the Due Process Clause of the Fifth Amendment. (394 U.S. at 630 n.8, 89 S.Ct. 1322. See also Comment, A Strict Scrutiny of the Right to Travel, 22 U.C.L.A.L.Rev. 1129, 1140-45 (1976); Comment, The Right to Travel: In Search of a Constitutional Source, 55 Neb.L.Rev. 117 (1975); Note, The Right to Travel Quest for a Constitutional Source, 6 Rutgers-Camden L.J. 122 (1974).)
 More recently, the Court has distinguished between the right to travel interstate, which "is virtually unqualified," and "the 'right' of international travel," which "can be regulated within the bounds of due process." (Califano v. Torres (1978) 435 U.S. 1, 4 n.6, 98 S.Ct. 906, 908 n.6, 55 L.Ed.2d 65; Califano v. Aznavorian (1978) 439 U.S. 170, 176-77, 99 S.Ct. 471, 58 L.Ed.2d 435.)
 
 
 [2]
 Despite the breadth of the language, the Court indicated that it would not strike down all durational residency requirements. Some durational residency requirements would be upheld because compelling state interests justified them. On the other hand, other durational residency requirements might not be "penalties upon the exercise of the constitutional right of interstate travel." (394 U.S. at 638 n.21, 89 S.Ct. at 1333 n.21.) Thus, the Court expressly left open questions "of the validity of waiting-period Or residence requirements determining eligibility to vote, eligibility for tuition-free education, to obtain a license to practice a profession, to hunt or fish, and so forth." (Id.)
 
 
 [3]
 Of course, not every restriction imposed by the state based on residency requirement penalizes the right to travel, such as the restriction of voting rights to bona fide state residents. (Dunn v. Blumstein, supra, 405 U.S. at 337 n.7, 342 n.13, 343-44, 92 S.Ct. 995.) Nor can a claim of infringement of the right to travel be based upon the fact that restrictions applied to all persons within the state may be greater than those imposed by another state, such as a higher age requirement for obtaining a driver's license. (405 U.S. at 342 n.12, 92 S.Ct. 995.) "Where, for example, an interstate migrant loses his driver's license because the new State has a higher age requirement, a different constitutional question is presented. For in such a case the new State's age requirement is not a Penalty imposed solely because the newcomer is a new resident; instead, all residents, old and new, must be of a prescribed age to drive." (405 U.S. at 342 n.12, 92 S.Ct. 1003 n.12.) See Califano v. Torres (1978) 435 U.S. 1, 4, 98 S.Ct. 906, 908, 55 L.Ed.2d 65 (concluding that the Constitution does not require "that a person who travels to Puerto Rico must be given benefits superior to those enjoyed by other residents of Puerto Rico if the newcomer enjoyed these benefits in the State from which he came."); Moore v. Supreme Court of South Carolina (D.S.C.1977) 447 F.Supp. 527, Aff'd mem. (4th Cir. 1978) 577 F.2d 735 (upholding state requirement that practicing attorneys be graduates of ABA-approved law schools because "the classification is totally unrelated to interstate travel," and "applies to residents and nonresidents alike." 447 F.Supp. at 530.)
 
 
 [4]
 In defining the meaning of "travel" in this manner, the Court adopted the definition used by Judge Coffin in Cole v. Housing Authority of Newport (1st Cir. 1970) 435 F.2d 807, 811. The Court also cited with approval Judge Coffin's analysis of the "penalty problem." (415 U.S. at 257 n.10, 94 S.Ct. 1076.)
 
 
 [5]
 Deprivations which are only uncomfortable are not enough, such as conditioning lower tuition at state institutions of higher education upon a one-year residency requirement. (Starns v. Malkerson (D.Minn.1970) 326 F.Supp. 234, Aff'd mem. (1971) 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527; Sturgis v. Washington (W.D.Wash.1973), 368 F.Supp. 38, Aff'd mem. (1973) 414 U.S. 1057, 94 S.Ct. 563, 38 L.Ed.2d 464.) A denial of non-emergency medical care was held to be a sufficiently significant deprivation to constitute a penalty on interstate migration. (415 U.S. at 259-61, 94 S.Ct. 1076.)
 
 
 [6]
 Workers hired or regularly employed in Nevada who are temporarily working for their Nevada employer outside Nevada may also be covered. (Nev.Rev.Stat. § 616.520.)
 
 
 [7]
 Nevada acknowledges that all recipients of disability and death benefit pensions are equally qualified to receive cost-of-living increases because the state is prepared to pay them to any member of the class so long as he or she resides in Nevada. Thus, the Nevada system does not involve distinctions between different types of disabilities that are compensated or different types of medical procedures that are funded which provide class differentiation based upon criteria other than those receiving constitutional protection. Thus, such cases as Geduldig v. Aiello (1974) 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256; and Maher v. Roe, supra, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484, are inapposite
 
 
 [8]
 Although Mrs. Fisher moved to California before the cost-of-living increases were adopted, she has been as effectively penalized by the Nevada classification as have persons who moved after the cost-of-living increases took effect. All recipients of NIC pensions who have left Nevada are denied the increases solely because of their migration, regardless of when they moved. State classifications need not be shown actually to have deterred travel before they can be found to have infringed upon the constitutional right to travel. The view that actual deterrence must be shown represents "a fundamental misunderstanding of the law." (Dunn v. Blumstein, supra, 405 U.S. at 339-41, 92 S.Ct. at 1001.)
 
 
 [9]
 The district court premised its rejection of appellant's right to travel claim on the grounds that Shapiro and its progeny only apply to durational residency requirements and not simple residency requirements. Yet the Supreme Court's approval of simple residency requirements for welfare, voting, and medical care in Shapiro and progeny was based on the premise that these requirements do not penalize interstate migration. The Supreme Court has clearly indicated that all simple residency requirements are not free from constitutional infirmity. Only the term before last the Court noted: "Some distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual States, and are permitted; other distinctions are prohibited because they hinder the formation, the purpose, or the development of a single Union of those States." (Baldwin v. Montana Fish & Game Comm'n (1978) 436 U.S. 371, 383, 98 S.Ct. 1852, 1860, 56 L.Ed.2d 354; See Hicklin v. Orbeck (1978) 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (invalidating an Alaska program of employment preference for residents under the Privileges and Immunities Clause of Art. IV, § 2.)
 
 
 [10]
 A migrant's new state of residence may not provide the same kind of governmental services as his old state, but this does not represent a penalty on interstate migration. (See note 3, Supra, and accompanying text.) The right to travel does not require all states to provide the same level of benefits, because states providing less generous benefits do not treat those who have exercised their right to travel any differently from the rest of their residents
 
 
 [11]
 Appellees argue that because "today's Nevada taxpayers support the supplemental benefits program, while yesterday's Nevada employers support the basic workmen's compensation program," cost-of-living increases can be restricted to current residents. This argument ignores the fact that the cost-of-living increases are paid from the interest earned from a one-time appropriation to the silicosis and disabled pension fund. Thus, yesterday's taxpayers are financing both the cost-of-living increases and the new program of workers' compensation benefits for workers with silicosis. In any case, the question whether Nevada has penalized interstate migration does not turn on how Nevada finances its various workers' compensation programs
 
 
 [12]
 In Califano v. Torres, supra, 435 U.S. at 4, 98 S.Ct. at 908, the Supreme Court held that the Constitution does not require "that a person who travels to Puerto Rico must be given benefits superior to those enjoyed by other residents of Puerto Rico if the newcomer enjoyed those benefits in the State from which he came."
 
 
 [13]
 Thus, the deprivation suffered by Mrs. Fisher is of a different character entirely from that involved in Sosna v. Iowa (1975) 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532, where the Supreme Court approved a state requirement that resulted in a one-year delay in obtaining a divorce decree