HAWAII BOATING ASSOCIATION, Jack Campbell, John Ireton, Thomas Herrington, John O'Connor, Paul Parker and Delbert Smith, Plaintiffs-Appellants,

v.

WATER TRANSPORTATION FACILITIES DIVISION, DEPARTMENT OF TRANSPORTATION, STATE OF HAWAII, Ryokichi Higashionna, individually and in his capacity as Director, Department of Transportation, Charles Swanson, individually and in his capacity as Deputy Director, Department of Transportation, and David Parsons, individually and in his capacity as Manager, Oahu District Boating Program, Defendants-Appellees.

No. 79–4836.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 29, 1981.

Decided July 20, 1981.

Lowell K. Y. Chun-Hoon, Honolulu, Hawaii, for plaintiffs-appellants.

Glen I. Kimura, Honolulu, Hawaii, for defendants-appellees.

Before KILKENNY, SNEED and FARRIS, Circuit Judges.

KILKENNY, Circuit Judge:

Appellants, members of a class certified as "persons who have applied for permanent mooring privileges in the small boat harbors of ... Hawaii ... since June 9, 1976, who have resided in the State less than twelve months ... and who intend to settle and abide in the State", commenced this action against the State of Hawaii and several of its political subdivisions and officers challenging the constitutionality of Act 221, 1976 Hawaii Sess. Laws on the ground that the Act discriminated against non-resident boat owners. The district court, rejecting challenges under the Equal Protection Clause, the Privileges and Immunities Clause of Article IV,[1] 42 U.S.C. § 1983, and the Land and Water Conservation Fund Act, granted summary judgment for appellees. We affirm.

---

1. U.S.Const. Art. IV, § 2, Cl. 1 states: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

## FACTUAL BACKGROUND

Sections 266–21 and 266–21.1 of the Hawaii Revised Statutes—pertaining to "the purposes and use of state small boat harbors" and "permits and fees for state small boat harbors"—were amended effective June 9, 1976, by Act 221, 1976 Hawaii Sess. Laws.[2] The state Small Boat Harbor Rules and Regulations [SBHRR] were subsequently amended to conform to the guidelines enacted in Act 221. Appellants strenuously object to the following three changes effected by the Act.

(1) *15% Liveaboard Quota*—Although there had previously been no limit on the number of mooring berths allowed to be used as a principal place of habitation, Hawaii Rev.Stat. § 266–21 was amended to limit the number of berths available for liveaboard purposes to "no more than fifteen percent of the respective total moorage space available as of July 1, 1976 at the Ala Wai and Keehi Boat Harbors";

(2) *Discriminatory Application, Mooring, and Liveaboard Fees*—Hawaii Rev. Stat. § 266–21.1(c)(1) requires that moorage fees "shall be higher for non-residents" than residents and § 266–21.1(c)(2)(ii) requires that the application fee shall be "not less than $100.00 for non-residents."

Hawaii Rev.Stat. § 266–21.1(c)(3) also provides that if a vessel is used as a principal place of habitation, the permittee shall pay a liveaboard fee in addition to the moorage fee. The liveaboard fee shall be "not less than two times the moorage fee if the permittee is a state resident, and not less than three times the moorage fee if the permittee is a non-resident"; and

(3) *Extended Trip Penalty*—As a condition for maintaining mooring privileges, the regulations require the payment of mooring fees when vessels are absent from their berths for more than thirty days, irrespective of whether the berths are occupied during the permittee's vessel's absence by other fee-paying vessels.

Act 221, among other things, directs that all harbor revenues, including mooring fees, shall be deposited in a special boating fund to defray the cost of administering a comprehensive state wide boating program as specified under Hawaii Rev.Stat. § 266–20.

The legislature described the purpose and use of state small boat harbors in Hawaii Rev.Stat. § 266–21 as follows:

"State small boat harbors are constructed, maintained, and operated for the primary purpose of promoting recreational boating activities and the landing of fish. For the purpose of this section 'recreational boating activities' means the utilization of watercraft for sports, hobbies, or pleasure. To implement this purpose, only vessels in good material and operating condition that are regularly navigated beyond the confines of the small boat harbor, and which are used for recreational activities or the landing of fish shall be permitted to moor, anchor, or berth at such harbor or use any of its facilities."

According to the final conference committee reports of both Houses, Act 221 was intended to "equalize the burden of cost of constructing, operating and maintaining state small boat harbors for the state taxpayers." Senate Conference Committee Report No. 38–76 (April 13, 1976); H. R. Conference Committee Report No. 36 (April 13, 1976). Appellants place great reliance on the Act's early legislative history, although this history was apparently superseded by the above-quoted final conference committee reports. In contrast to the final reports, that reflect solely a concern to equalize the burden of paying for the harbor facilities, the early legislative history reflects extensive concern about the increased number of liveaboards, the attend-

---

**2.** Although Hawaii Rev.Stat. § 266–21.1 was substantially amended in 1980, the language presently at issue remains unchanged.

ant increase in harbor pollution and crime, and the high percentage of non-residents among the liveaboard population.

The Ala Wai and Keehi Boat Harbors are the only harbors involved in this appeal and are classified and operated by the state as small boat harbors. These harbors provide 702 and 108 moorage berths respectively, and together provide approximately 44% of the public berths in the state. The state indicates that the waiting period for obtaining mooring privileges is from three and one-half to four years at Ala Wai and one and one-half to two years at Keehi.

## CONTENTIONS

I. Appellants contend that the district court erred in holding that:

(a) Act 221 does not violate equal protection because the legislative purpose of equalizing the cost burden of maintaining the state's small boat harbors was a rational basis for the disparate treatment accorded residents and non-residents;

(b) Act 221 does not violate the Privileges and Immunities Clause because it does not implicate a fundamental right;

(c) Act 221 does not violate the Federal Land and Water Conservation Fund Act; and

(d) Act 221 does not violate appellants' civil rights.

II. Does the record show a genuine issue of material fact under the provisions of Rule 56, FRCivP?

## DISCUSSION

### I.

A. *Equal Protection.*

■ Appellants argue that the district judge erred in not applying the strict scruti-

ny test to the legislative classification involved.[3] The judge applied the rational basis standard because the Act did not penalize the right to travel and because no suspect classification was involved. We agree with the district judge's conclusions with respect to the applicable legal standard.

The right to travel is a fundamental right, and it has been recognized that durational residency requirements—because they disadvantage a class of persons who have recently exercised the right to travel —may, in certain circumstances, unduly infringe upon this right. In *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the Court held unconstitutional a one-year durational residency requirement for welfare assistance. The Court stated, however:

"We imply no view of the validity of waiting-period or residence requirements determining eligibility to vote, eligibility for tuition-free education, to obtain a license to practice a profession, to hunt or fish, and so forth. Such requirements may promote compelling state interests on the one hand, or, on the other, may not be penalties upon the exercise of the constitutional right of interstate travel." *Id.* at 638, n. 21, 89 S.Ct. at 1333 n.21.

The Court held, in *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), and *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), that durational residency requirements which involved deprivations of the right to vote and free non-emergency medical care triggered strict scrutiny. In *Maricopa County*, however, the Court noted that "The amount of im-

---

**3.** Appellants object primarily to the fee differential established by the statute. And, we consider the fee structure to be the only legislative classification relevant to our discussion of the allegedly unjustified discrimination against non-residents. Appellants have not established how the liveaboard quota or the extended trip penalty treat non-residents differently from residents.

The fee differential is not insubstantial. The application fee is $100.00 for non-residents and

$15.00 for residents. The liveaboard fee for non-residents is three times the monthly mooring charge, while resident liveaboards pay twice as much. Although the statute authorizes higher mooring fees for non-residents, appellants inform us that, at the present time, the mooring fees are not different for non-residents. (If anything, this indicates that the Department of Transportation is not mulcting non-residents).

pact required to give rise to the compelling-state-interest test [has] not been made clear." *Id.* at 256–7, 94 S.Ct. at 1081 (footnote omitted). In *Fisher v. Reiser*, 610 F.2d 629 (CA9 1979) *cert. denied*, 447 U.S. 930, 100 S.Ct. 3029, 65 L.Ed.2d 1124 (1980), we noted the importance of the "nature of the benefit denied." *Id.* at 635. In fact, Judge Hufstedler, dissenting in *Fisher*, after reviewing the right to travel cases, commented that "The Court [has] indicated that the 'penalty' required to invoke strict scrutiny involves *a genuinely significant deprivation*, such as a denial of the basic 'necessities of life' (as in *Shapiro*), or the denial of a 'fundamental political right' (as in *Dunn*)." *Id.* at 639 (footnote omitted) (emphasis added). Judge Hufstedler also noted that "Deprivations which are only uncomfortable are not enough, such as conditioning lower tuition at state institutions of higher education upon a one-year residency requirement." *Id.* at 639, n. 5.[4]

The district judge found that strict scrutiny was not applicable because the durational residency requirement for preferential rates for mooring privileges in recreational[5] boat harbors was not a significant penalty on the right to travel. To use Judge Hufstedler's terminology, this "deprivation" was merely "uncomfortable." The district judge found that this case was more like the college tuition cases,[6] which stand for the proposition that "conditioning lower tuition at state institutions of higher education upon a one-year residency requirement" does not impose a "penalty" on the right to travel justifying invoking strict scrutiny. We agree with the district judge that the "deprivation" involved in this case—the failure to provide a berth in a recreational boat harbor at the same rate as a resident—does not operate as a *significant* "penalty" on the right to travel.

■ Appellants argue that even if no fundamental right has been infringed, strict scrutiny applies because a suspect classification is involved. We disagree. Appellants only shred of evidence supporting this contention is a survey of those with mooring privileges in which all the responding non-residents were Caucasians. (Approximately 40% of those with mooring permits responded. Of those responding, 25 were non-residents. All 25 were Caucasians.) Appellants contend that "the legislature consciously excluded from the State a non-resident population commonly known and subsequently documented by Dr. Feeney's survey to be 100% Caucasian." We note that the contention that "non-residents of Hawaii" comprise one racial class defies reali-

4, In *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), the Court in discussing the "penalty" concept, stated: "Penalties are most familiar to the criminal law, where criminal sanctions are imposed as a consequence of proscribed conduct. *Shapiro* and *Maricopa County* recognized that denial of welfare to one who had recently exercised the right to travel across state lines was sufficiently analogous to a criminal fine *to justify strict judicial scrutiny.*" *Id.* at 474, n. 8, 97 S.Ct. at 2383 n. 8.

5. It is beyond dispute that the boat harbors should be classified as "recreational." The two harbors at issue are specifically designated as small boat harbors and those harbors are defined in the legislation as being "constructed, maintained, and operated for the primary purpose of promoting recreational boating activities and the landing of fish." Hawaii Rev.Stat. § 266–21. The legislation then defines "recreational boating activities" as the utilization of watercraft for sports, hobbies, or pleasure. A certain percentage of those with mooring privileges use their boats as their principal place of habitation. This does not, however, alter the "recreational" character of the boat harbors. The liveaboard use is incidental to the "recreational" aspect. It is clear that the harbors are not operated to provide cheap alternative housing. The public housing cases, *e. g. Cole v. Housing Authority of the City of Newport*, 435 F.Supp. 807 (CA1 1970), relied upon by appellants are simply inapposite. The limited liveaboard use does not convert the "recreational" character of the boat harbors into a "basic necessity of life", *i. e.*, shelter.

6. *E. g., Sturgis v. Washington*, 414 U.S. 1057, 94 S.Ct. 563, 38 L.Ed.2d 464, *aff'g mem.* 368 F.Supp. 38 (W.D.Wash.1973); *Starns v. Malkerson*, 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971), *aff'g mem.* 326 F.Supp. 234 (D.Minn.1970); *Hasse v. Regents of the University of Hawaii*, 363 F.Supp. 677 (D.Haw.1973); *Kirk v. Board of Regents of the University of California*, 273 Cal.App.2d 430, 78 Cal.Rptr. 260 (1969), *appeal dismissed*, 396 U.S. 554, 90 S.Ct. 754, 24 L.Ed.2d 747 (1970).

ty. Furthermore, the legislative classification is racially neutral and appellants have not directed our attention to *anything* in the legislative history supporting the existence of a *racially* discriminatory motive. Standing alone, the disproportionate impact asserted in this case, is simply not sufficient to trigger the application of strict scrutiny. The district court was clearly correct in concluding that no suspect classification was involved.

■ Since this case does not involve a "penalty" on the right to travel or a suspect class, the legislative classification must be tested by the rational basis standard. The district court found no evidence supporting the conclusion that the cost differential was "arbitrary" or "irrational." The court found that the fee structure was rationally related to a valid legislative goal, *i. e.* equalizing costs attendant to maintaining and constructing small boat harbors and noted that "Residents have recently contributed to the state's economy through employment and state taxes, while non-residents have not." As the Supreme Court has stated: "We perceive no duty on the State to have its licensing structure parallel or identical for both residents and nonresidents, or to justify to the penny any cost differential it imposes in a purely recreational, noncommercial, nonlivelihood setting. Rationality is sufficient." *Baldwin v. Montana Fish and Game Comm'n.*, 436 U.S. 371, 391, 98 S.Ct. 1852, 1864, 56 L.Ed.2d 354 (1978). We agree with the trial judge that Hawaii's classification is not "irrational."

### B. *Privileges and Immunities.*

■ The district judge, concluding that "The higher mooring fees do not operate as a significant penalty upon the right to travel and the right to a berth at the same [rate] as residents receive is not a fundamental privilege of citizenship", summarily rejected the privileges and immunities contention. We do not believe that the Privileges and Immunities Clause is applicable to the facts of this case. In a broad sense, the clause serves, in certain contexts, to protect non-residents from discrimination. As the Court stated in *Toomer v. Witsell*, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948): "The primary purpose of this clause ... was to help fuse into one Nation a collection of independent, sovereign States. It was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Id.* at 395, 68 S.Ct. at 1162 (footnote omitted). This class action does not appear to present a challenge to a legislative discrimination against non-residents. The class, as certified, only includes residents of Hawaii, albeit residents who have resided in the state for less than twelve months. Because *this* case does not, therefore, appear to present a challenge, *by non-residents*, to the discriminatory fee structure, the Privileges and Immunities Clause is not applicable. *See Austin v. New Hampshire*, 420 U.S. 656, 662, 95 S.Ct. 1191, 1195, 43 L.Ed.2d 530 (1975).

In any event, we hold that appellants have not established a viable privileges and immunities claim. The district court's conclusion—that the right of access, at equal rates, to mooring privileges at a recreational boat harbor is not "fundamental"—is supported by the case law. In *Baldwin*, the Court was faced with a challenge to Montana's elk hunting license scheme, which imposed substantially higher fees on non-residents. The Court concluded:

"Appellants' interest in sharing this limited resource on more equal terms with Montana residents simply does not fall within the purview of the Privileges and Immunities Clause. Equality in access to Montana elk is not basic to the maintenance or well-being of the Union. Appellants do not—and cannot—contend that they are deprived of a means of a livelihood by the system or of access to any part of the State to which they may seek to travel. We do not decide the full range of activities that are sufficiently basic to the livelihood of the Nation that the States may not interfere with a non-resident's participation therein without similarly interfering with a resident's participation. Whatever rights or activi-

ties may be 'fundamental' under the Privileges and Immunities Clause, we are persuaded, and hold, that elk hunting by non-residents in Montana is not one of them." *Id.*, 436 U.S. at 388, 98 S.Ct. at 1862–63.

This reasoning is equally applicable to, and dispositive of, the instant case.

Appellants assert that, in light of *Hicklin v. Orbeck*, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), *Baldwin* is no longer good law. In *Hicklin*, the Court invalidated an Alaska statute which required that all Alaskan oil and gas leases, easements or right-of-way permits for oil or gas pipelines, and unitization agreements contain a requirement that qualified Alaska residents be hired in preference to non-residents. In *Baldwin*, Justice Brennan had criticized the majority's inquiry into whether elk hunting was a "fundamental" right, and asserted that "our primary concern is the State's justification for its discrimination." *Baldwin, supra*, 436 U.S. at 402, 98 S.Ct. at 1870 (Brennan, J., dissenting). Justice Brennan, writing for a unanimous court in *Hicklin*, used, for the most part, the very analysis he advocated in dissent in *Baldwin*. *Hicklin* did not, however, signal an abandonment of the "fundamental" right approach. In *Hicklin*, there was simply no need to make that inquiry. The *Baldwin* majority had explicitly stated that the "right" involved in *Hicklin*—the right of a non-resident to earn a livelihood without being subject to unjustified discrimination—was "fundamental." *Baldwin, supra*, 436 U.S. at 387, 98 S.Ct. at 1862. Therefore, *Hicklin* is not inconsistent with *Baldwin*.

The two cases establish a two-step process. In order to come within the purview of the Privileges and Immunities Clause, the right involved must be "fundamental", as that term is described in *Baldwin*. If that step is met, the state must justify its discrimination by satisfying the requirements articulated in *Hicklin*. Reading *Baldwin* and *Hicklin* together, allows non-residents protection against significant forms of discrimination, while recognizing that, in certain areas, a sovereign state may act in the interests of its own citizens. This view acknowledges that, although a collection of

independent, sovereign states has been fused into one nation, these independent, sovereign states do retain a significant degree of autonomy.

The Supreme Court's reasoning in *Baldwin* controls the result in this case. The district judge did not err in rejecting appellants' privileges and immunities claim.

### C. Land and Water Conservation Fund Act.

■ We agree with the district judge's conclusion that appellants' Land and Water Conservation Fund Act (LWCFA) claim is without merit. The relevant section of the Act provides:

"*With respect to property acquired or developed with assistance from the fund*, discrimination on the basis of residence, including preferential reservation or membership systems, is prohibited *except to the extent that reasonable differences* in admission and other fees *may be maintained on the basis of residence.*" 16 U.S.C. § 460*l*–8(f)(8). [Emphasis added].

As stated by the trial court, there are at least two valid reasons why the challenged legislation does not violate the LWCFA: (1) there has been no showing whatsoever that LWCFA funds were used to acquire or develop the property involved (Ala Wai and Keehi Harbors); and (2) the differential in mooring fees was not unreasonable.

### D. Civil Rights Act.

Appellants concede that their 42 U.S.C. § 1983 claim must fail if the district judge's rulings on the other issues are upheld. Since we have concluded that the district judge's other rulings were correct, his disposition of the § 1983 claim was also proper.

### II.

Appellants contend that there were genuine issues of material fact which precluded the grant of summary judgment. In order to withstand a motion for summary judgment, there must be a legal theory which remains viable under the resisting party's asserted version of the facts. *See Friends of the Earth v. Coleman*, 513 F.2d 295 (CA9 1975).

There is nothing whatsoever in the showing before the court which would indicate that appellees would not be entitled to a directed verdict if the case were to proceed to trial. In other words, no genuine issues of *material* fact have been presented. There was no point in going to trial on appellants' contentions that "recreational" benefits were not involved and that the fee differential imposed a "penalty" on the right to travel. The statute and the nature of the activity make it clear that recreational activity was involved, and the district court's "penalty" analysis would not have been affected by testimony of the severity of the economic consequences involved. And, we have already concluded that appellants have not presented evidence that would warrant going to trial on the racial discrimination claim.

### CONCLUSION

We conclude that the judgment of the district court must be affirmed.

IT IS SO ORDERED.