**Randal T. BARBER, Plaintiff–Appellant,**

**and**

**Hawaiian Navigable Waters Preservation Society, a non profit corporation and on behalf of its members and all others similarly situated, Plaintiff,**

**v.**

**STATE OF HAWAI'I, et al.; United States of America, Defendants–Appellees,**

**and**

**United States of America, et al., Defendants.**

**HAWAIIAN NAVIGABLE WATERS PRESERVATION SOCIETY, a non profit corporation and on behalf of its members and all others similarly situated, Plaintiff–Appellant,**

**v.**

**STATE OF HAWAI'I; Rex Johnson, in his capacity as Director of Hawai'i Department of Transportation, et al., Defendants–Appellees.**

**Nos. 93–15678, 93–15856.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 15, 1994.

Decided Nov. 30, 1994.

Morgan J.C. Scudi, Huth, Farmer, and Scudi, San Diego, CA, for plaintiff-appellant, Hawaiian Navigable Waters Preservation Society.

Joseph A. Ryan, Ryan & Ryan, Honolulu, HI, for plaintiff-appellant, Randal T. Barber.

Dawn N.S. Chang, Deputy Atty. Gen., State of Hawai'i, Honolulu, HI, for defendants-appellees, State of Hawai'i, Rex Johnson, Director of the Hawai'i Dept. of Transportation, William W. Paty, Jr., Director of the Department of Land and Natural Resources, David E. Parsons, Hawai'i State Boating Manager, Paul A. Dolan, Boating Regulation Manager, Stephen L. Thompson, Oahu Small Boat Harbors Manager.

Girard D. Lau, Deputy Atty. Gen., Honolulu, HI, for defendant-appellee, State of Hawai'i.

Thomas Helper, Asst. U.S. Atty., Honolulu, HI, for defendant-appellee, U.S.

Before: FARRIS, BEEZER, Circuit Judges and MUECKE *, District Judge.

FARRIS, Circuit Judge:

This action concerns the right of the State of Hawaii to enact legislation and adopt rules regulating anchorage and mooring privileges within its ocean waters and navigable streams. The Hawaiian Navigable Waters Preservation Society and Randal T. Barber allege that such legislation and regulations improperly abridge their rights under the U.S. Constitution, Treaties, Federal law, admiralty law, and common law. The district court granted summary judgment for the United States and the State of Hawaii. 823 F.Supp. 766. We affirm.

## BACKGROUND

The Hawaiian Navigable Waters Preservation Society is a non-profit corporation that claims to protect the rights of persons navigating the ocean waters surrounding Hawaii. Randal T. Barber is the owner of a large barge at free anchor off the shores of Oahu. He uses the barge to warehouse and store marine equipment that he buys and sells. Barber contends that Hawaii has been economically invaded by the Japanese, with the help of Hawaiian state authorities. The focus of his action is the Ke'ehi Lagoon, a recreational area used by fishermen, swimmers, canoe racers, and recreational boaters on the island of Oahu.

In 1988, the State of Hawaii adopted legislation providing the Hawaii Department of Transportation with the authority to regulate anchoring and mooring within the ocean waters and navigable streams of the state. 1988 Haw.Sess.Laws 379. In 1991, the jurisdictional authority for recreational boating was transferred to the Department of Land and Natural Resources. 1991 Haw.Sess. Laws 272. The codification of those provisions is found at Hawaii Revised Statutes, Chapter 200 (Supp.1992).[1]

In 1991, the Department of Transportation, pursuant to its authority under the Hawaii Administrative Procedures Act, Haw. Rev.Stat. § 91–1 to –18 (1985), adopted rules regulating anchoring and mooring in state waters. Hawaii Administrative Rules §§ 19–61 regulates small boat harbors. With re-

* The Honorable C.A. Muecke, United States District Judge for the District of Arizona, sitting by designation.

1. Haw.Rev.Stat. § 200–6 (Supp.1992) provides: (b) No person shall anchor, moor, or otherwise place any vessel, houseboat, or other contrivance on or within the ocean waters or navigable streams of the State without a permit from the department [of land and natural resources].

gard to the Ke'ehi Lagoon, the relevant administrative regulations provide:

> No person shall anchor or moor a vessel or houseboat within Ke'ehi Lagoon except at a location and in accordance with a mooring permit issued by the department under the provisions of section 19–62–2 [requiring vessel owners to obtain permission from the State to use state property and harbor facilities] and section 19–62–17 [requiring vessel owners to moor at assigned locations].

Section 19–66–31(c), Hawaii Administrative Rules.

On February 1, 1991, the Department of Transportation was issued a federal permit for the installation of approximately 360 moorings at Ke'ehi Lagoon. The Department of Transportation and the United States Coast Guard are parties to a cooperative agreement that concerns the public waters of the state. According to Hawaii, the purpose of these regulations restricting anchoring and mooring privileges in and around the Ke'ehi Lagoon is to 1) ensure boater safety, and 2) to ensure safe use of the Lagoon by other persons using it for recreational purposes.

The Preservation Society commenced this action challenging the constitutionality of all Hawaii regulations and legislation affecting the rights of mariners to anchor and navigate in the ocean waters surrounding the islands of Hawaii. On March 5, 1993, the district court consolidated the Preservation Society's case with that of Barber and granted summary judgment in favor of the State of Hawaii and the federal government. On April 1, 1993, the district court denied the Preservation Society's and Barber's motions for amendment of judgment, or relief from judgment, or reconsideration of the order entered.

## THE HAWAIIAN NAVIGATIONAL WATERS PRESERVATION SOCIETY'S APPEAL

We review a grant of summary judgment de novo. *Jones v. Union Pac. R.R. Co.*, 968 F.2d 937, 940 (9th Cir.1992).

### I. PREEMPTION

Federal preemption exists when government statutes or regulations include language explicitly preempting State action in a given area. In addition, the federal government can implicitly preempt state action. *Wardair Canada Inc. v. Florida Dep't of Revenue*, 477 U.S. 1, 6, 106 S.Ct. 2369, 2372, 91 L.Ed.2d 1 (1986). We will find implicit preemption where the intent of Congress is clearly manifested, or implicit from a pervasive scheme of federal regulation that leaves no room for state and local supplementation, or implicit from the fact that the federal law touches a field (e.g. foreign affairs) in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 604–05, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532 (1991) (internal quotations omitted).

Finally, we will find a State law to be preempted when an actual conflict exists between State and Federal law. *Beveridge v. Lewis*, 939 F.2d 859, 862 (9th Cir.1991). In determining whether an actual conflict exists, we are "guided by the [Supreme] Court's reluctance to entertain hypothetical conflicts because '[i]n this as in other areas of coincident federal and state regulation, the teaching of [the Supreme] Court's decisions ... enjoin[s] seeking out conflicts between state and federal regulation where none clearly exists.'" *Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 499 (9th Cir.1984), *cert. denied sub nom., Chevron U.S.A., Inc. v. Sheffield*, 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985) (quoting *Seagram & Sons v. Hostetter*, 384 U.S. 35, 45, 86 S.Ct. 1254, 1261, 16 L.Ed.2d 336 (1966)) (internal quotation and citations omitted). We will consider future conflicts as they arise. *Beveridge*, 939 F.2d at 863.

The Preservation Society does not argue that Congress has explicitly preempted action by the State of Hawaii affecting mooring and anchoring privileges off its coast. It argues 1) that Hawaii's regulations are in actual conflict with federal legislation and regulation, and 2) that even if no single statute is in actual conflict with Hawaii's regula-

tions, federal regulation in the field of navigation is so extensive that it manifests an implicit intent on the part of Congress to preempt Hawaii's actions. Neither argument is persuasive.

*A. Actual Conflict*

According to the Preservation Society, the Submerged Lands Act preempts state regulation of mooring and anchoring because mooring and anchoring affect navigation, and, under the Submerged Lands Act, navigation is the exclusive domain of the federal government. In addition, the Preservation Society argues 1) that Hawaii's regulations are in conflict with 33 C.F.R. § 110.128d(c), which establishes a federal anchorage area in Ke'ehi Lagoon, and 2) that the Hawaiian regulations are in conflict with 33 U.S.C. § 2030, which regulates the maintenance of lights while vessels are at anchor. These arguments are based on exaggerations and misconstructions of federal law. There is no actual conflict.

*1. The Submerged Lands Act.* By virtue of the Submerged Lands Act, 43 U.S.C. §§ 1311 *et seq.* (1986 & West Supp.1993), Congress recognized that the lands beneath the navigable waters within three miles of state boundaries belonged to the respective states. The Preservation Society's preemption argument relies on the historical context of the Act.

Before Congress passed the Submerged Lands Act, the Supreme Court recognized the federal government as the exclusive owner of submerged lands (and the waters above them) within three miles of the boundaries of the United States. *United States v. California,* 332 U.S. 804, 805, 68 S.Ct. 20, 20, 92 L.Ed. 382 (1947). Consequently, before the Submerged Lands Act, the states' jurisdiction ended at the low-tide mark of their tidal shores.

In 1953, Congress passed the Submerged Lands Act to negate the Supreme Court's ruling. *United States v. California,* 436 U.S. 32, 37, 98 S.Ct. 1662, 1664, 56 L.Ed.2d 94 (1978). The Act provided that:

> (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop and use the said lands and natural resources all in accordance with applicable State law ... are hereby[ ] vested in and assigned to the respective States....

43 U.S.C. § 1311(a). The Act also provided that "[n]othing in this subchapter ... shall affect the use, development, improvement, or control by ... the United States of said ... waters for the purposes of navigation ..." 43 U.S.C. § 1311(d).[2]

According to the Preservation Society, Congress' explicit indication that it reserved jurisdiction over the navigable waters of the states indicates that the states never obtained the right to regulate navigation over the waters above the submerged lands. The flaw in the argument is that the Submerged Lands Act *did* provide the states with concurrent jurisdiction over the waters above the submerged lands. The Supreme Court recognized as much in 1977 in *United States v. California,* 436 U.S. at 39, 98 S.Ct. at 1666 (1978).[3] The Court noted that the Submerged Lands Act implicated both "submerged lands *and waters.*" *Id.* (emphasis added); *see also Murphy v. Department of Natural Resources,* 837 F.Supp. 1217, 1223 (S.D.Fla.1993).

2. The Submerged Lands Act was specifically extended to Hawaii in the 1959 Act of Statehood. 48 U.S.C. § 491(5)(i).

3. That case was part of ongoing litigation stemming from an action brought before the Supreme Court in the 1940's. *United States v. California,* 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947). The first decree was entered in 1947, *United States v. California,* 332 U.S. 804, 68 S.Ct. 20, 92 L.Ed. 382 (1947); a supplemental decree was entered in 1966, *United States v. California,* 382 U.S. 448, 86 S.Ct. 607, 15 L.Ed.2d 517 (1966); and a second supplemental decree in 1977, *United States v. California,* 432 U.S. 40, 97 S.Ct. 2915, 53 L.Ed.2d 94 (1977). In each instance, jurisdiction was reserved to enter further orders necessary to effectuate the decrees. California initiated the 1977 suit under the 1966 reservation of jurisdiction. *United States v. California,* 382 U.S. at 453, 86 S.Ct. at 609.

The purpose of Section 1311(d) was not for the Federal Government to retain exclusive jurisdiction over navigation of the waters above the submerged lands, but for the Federal Government to retain concurrent jurisdiction over those waters. The plain language of Section 1311(d) does not indicate that Congress intended federal jurisdiction to be exclusive rather than concurrent.[4]

Congress' retention of the Federal Government's navigational servitude under the Submerged Lands Act means that the government may, without paying compensation, decrease the value of riparian property. *Boone v. United States,* 944 F.2d 1489, 1494 (9th Cir.1991). Unless and until the Federal Government adopts legislation or regulations pursuant to its navigational servitude that actually conflict with Hawaii's regulations, there is no preemption.

█ *2. 33 C.F.R. § 110.128d(c).* The Preservation Society next argues that because 33 C.F.R. chapter I establishes a special federal anchorage area in Ke'ehi Lagoon, additional state regulation within that area is preempted. 33 C.F.R. § 110.128d(c). This argument ignores the limited scope of 33 C.F.R. § 110.128d(c).

█ Under the Code of Federal Regulations, two classes of anchorage regulations are established: "special anchorage areas" (Subpart A) and "anchorage grounds" (Subpart B). 33 C.F.R. § 110. Subpart A is regulated by 33 C.F.R. § 110.1(a), which states:

> The areas described in Subpart A of this part are designated as special anchorage areas pursuant to the authority contained in an act amending laws for preventing collisions of vessels.... Vessels not more than 65 feet in length, when at anchor in any special anchorage shall not be required to carry or exhibit the white anchor lights required by the Navigation Rules.

33 C.F.R. § 110.1(a). Thus, under Subpart A, in "Special Anchorage Areas" such as Ke'ehi Lagoon, vessels in excess of 65 feet must exhibit white anchor lights while at anchor.

Subpart B regulates anchoring and mooring more extensively. However, Subpart B does not apply to "special anchorage areas" governed by Subpart A unless the area is also designated an "anchorage ground." 33 C.F.R. § 110.1(b) ("The anchorage grounds for vessels described in Subpart B of this part are established...."); *see also Beveridge,* 939 F.2d at 865. Ke'ehi Lagoon is not an "anchorage ground" subject to Subpart B.

33 C.F.R. § 110.128d(c)'s requirement that vessels in excess of 65 feet anchored in Ke'ehi Lagoon must exhibit white lights while at anchor does not conflict with Hawaii's regulations, which simply require that boats in the lagoon obtain a permit and moor in a designated area if the boat is to remain in the lagoon for more than 72 hours. The Coast Guard has stated that it sees no conflict between the federal regulations and Hawaii's mooring requirements. Until such time as the Federal Government chooses to regulate "Special Anchorage Areas" more extensively, there is no conflict between 33 C.F.R. § 110.128d(c) and Hawaii's regulations.

The Preservation Society also argues that Hawaiian regulation of mooring is preempted by 33 C.F.R. § 1.05–1, which vests the Office of Navigation Safety and Waterway Services with the authority to issue rules pertaining to anchorage grounds and special anchorage areas where such grounds and areas have been shown to generate controversy. 33 C.F.R. § 1.05–1(i)(2). The regulation provides that the ONSWS may not re-delegate its authority to issue rules. 33 C.F.R. § 1.05–1(i).

The Preservation Society argues that because the litigation has generated a conflict regarding the Ke'ehi Lagoon Special Anchor-

4. For what its worth (not much), the legislative history also supports this understanding of the nature of Section 1311(d). *See* H.Rep. No. 215, 83rd Cong., 1st Sess. 2 (1953) *reprinted in* 1953 U.S.C.C.A.N. 1385, 1406 ("the bill provides that, except to the extent that it is exercised in a manner inconsistent with applicable Federal laws, the police power of each coastal State may extend to that portion of the Continental Shelf which would be within the boundaries of such State if extended seaward to the outer margin of the shelf").

age Area, only the ONSWS may now issue rules. The argument ignores the fact that jurisdiction over the lagoon is concurrent. And although the ONSWS has exclusive federal jurisdiction to issue rules, it has chosen not to act. There is no conflict and therefore no preemption. The provisions of the Federal Code do not manifest federal intent that the only regulation with which boats in the Ke'ehi Lagoon need to comply must come from the ONSWS. 33 C.F.R. § 1.05-1.

*3. 33 U.S.C. § 2030.* The Preservation Society argues that Hawaii's regulations are preempted because federal regulations require that an anchored vessel be manned to respond in emergency conditions. However, the Preservation Society provides no citation in support of its contention. The district court was unable to identify a code provision in support of the contention. The closest provision is 33 U.S.C. § 2030, which requires anchor lights for vessels at anchor. Nothing in the statute implies that the vessels need be manned in order to maintain the anchor lights. There is no conflict.

*B. Implicit Preemption*

The Preservation Society argues that even if Hawaii's regulations are not in direct conflict with any federal statutes or regulations, they are nevertheless implicitly preempted. Although implicit preemption is one issue, the Preservation Society really raises three arguments in its favor: 1) Congressional intent to preempt state action is clearly manifested; 2) Congressional intent to preempt state action is implicit from the fact that its regulation of navigation is so extensive as to have occupied the field, leaving no room for state and local supplementation; 3) The area in question, navigation, is one in which the "federal interest is so dominant that the federal system is assumed to preclude enforcement of state laws on the same subject." *Mortier,* 501 U.S. at 605, 111 S.Ct. at 2481.

Congressional intent to preempt state action is far from clearly manifest, federal regulation has not occupied the field of navigation and the federal interest in navigation is not so dominant as the Preservation Society implies. There is no implicit preemption.

*1. Congressional Intent.* According to the Preservation Society, Congressional intent to preempt state action in the field of anchorage and mooring is manifested by Congress' express reservation of its navigational servitude under the Submerged Lands Act, 43 U.S.C. § 1311(d) and by Congress' direction that the Secretary of Transportation establish anchorage grounds for vessels in all harbors. 33 U.S.C. § 471.

The argument is not persuasive. As already noted, the Submerged Lands Act's express reservation of the navigational servitude does not imply that Congress intended to do so at the expense of concurrent state powers to regulate navigation. Legislative history indicates that Congress intended for the states to exercise concurrent jurisdiction over the waters above the Submerged Lands and the Supreme Court has so held. *See supra.*

In addition, the Preservation Society overstates the significance of 33 U.S.C. § 471. That statute provides:

> The Secretary of Transportation is authorized, empowered, and directed to define and establish anchorage grounds for vessels in all harbors, rivers, bays, and other navigable waters of the United States whenever it is manifest to the said Secretary that the maritime or commercial interests of the United States require such anchorage grounds for safe navigation....

*Id.*

Although the statute indicates that Congress intended for the Secretary of Transportation to author regulations governing anchorage grounds whenever it was in the interest of United States to do so, the statute does not indicate that such regulation was to be exclusive or that in the absence of regulation by the Secretary of Transportation, no other regulation was permissible. As the court noted in *Beveridge:*

> [J]ust because Congress has intended to reduce the possibility of cargo and vessel loss, prevent damage to structures on or near navigable waters, ensure that vessels comply with certain standards, and just

> because it believes that "navigation and vessel safety and protection of the marine environment are matters of major national importance," does not necessarily mean that [the States ... are] completely trammeled in all regulatory efforts.

*Beveridge,* 939 F.2d at 863 (internal citation omitted). Congress has not manifested a clear intent to preempt the field. *LCM Enters. v. Town of Dartmouth,* 14 F.3d 675, 684 (1st Cir.1994).

█ 2. *Occupying the Field.* The Preservation Society's second argument is that existing federal regulation is so extensive as to have occupied the field. There are two problems with this argument. First, "comprehensiveness alone is not enough to demonstrate a federal intent to occupy the entire field." *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d at 491. For example, in *Beveridge* the court found that the Ports and Waterways Safety Act, 33 U.S.C. §§ 1221 *et seq.,* a far more comprehensive piece of legislation than the statutes cited by the Preservation Society, did not implicitly preempt regulation by the City of Santa Barbara. *Beveridge,* 939 F.2d at 864; *see also Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978).

Second, federal legislation in the field of navigation is far from extensive. Although the Secretary of Transportation and the Coast Guard have extensive authority to regulate anchoring, mooring, and movement of vessels, their power is discretionary. The authorities may act to affect all navigational issues, but they need not and they have not.

Only three anchorage grounds in the waters off the coast of Hawaii have been established. 33 C.F.R. §§ 110.235–237. The first of these "provides anchorage space for one vessel" which must be a "nitrate laden vessel." *Id.* § 110.235. "Other vessels are cautioned against frequenting the area at any time." *Id.* The second anchorage ground is designated for "offshore pipeline terminal anchorages." *Id.* § 110.236. These anchorage grounds are designed to accommodate vessels in interstate or foreign commerce, and vessels in interstate and foreign commerce are exempt from Hawaii's anchoring restriction. Haw.Rev.Stat. § 200–6. The final anchorage ground is designated as a naval anchorage and "no vessel except a Naval vessel may anchor or moor in this anchorage...." *Id.* § 110.237.

Federal laws and regulations have not occupied the field of anchorage and mooring. *R.J. Reynolds Tobacco Co. v. Durham County,* 479 U.S. 130, 140, 107 S.Ct. 499, 506, 93 L.Ed.2d 449 (1986); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

3. *Federal Interest.* The Preservation Society's final argument is that the federal interest in navigation is so dominant that the federal system should be assumed to preclude enforcement of state laws on the same subject. The basis of the argument is that maritime jurisdiction is vested in the federal courts, *Sisson v. Ruby,* 497 U.S. 358, 370, 110 S.Ct. 2892, 2899, 111 L.Ed.2d 292 (1990), and the Constitution includes specific provisions prohibiting duties on tonnage (Article I, Section 10) and reserving power over interstate commerce for the Federal Government (Article I, Section 8, Clause 3). In addition, the Preservation Society and Barber cite the navigational servitude reserved by the Submerged Lands Act.

However, the argument is belied by the Supreme Court's longstanding recognition that anchorage and mooring rules are best left to the states in the absence of compelling government interests to the contrary. The *Beveridge* Court acknowledged this line of cases with its quotation from *Cushing v. Owners of The John Fraser,* 62 U.S. (21 How.) 106, 108 (1858):

> And the local authorities have a right to prescribe at what wharf a vessel may lie, and how long she may remain there ..., where she may anchor in the harbor, and for what time; ... And there is nothing in the regulations referred to in the Port of Charleston which is in conflict with any law of Congress....

*Id.*

The *Beveridge* court recognized that navigational issues have changed considerably in the past century but noted that "there is no reason to believe that Congress intended to occupy the field in the area of mooring....

It might even be said that localities retain greater autonomy in this area." *Beveridge* 939 F.2d at 864 (citing *Bass River Associates v. Mayor of Bass River Township,* 743 F.2d 159 (3rd Cir.1984)). Anchorage and mooring are not subject areas that are particularly federally sensitive in nature, in the same way that foreign affairs is. The Hawaiian regulations are not preempted.

## II. THE COMMERCE CLAUSE

The Preservation Society also contends that the Hawaiian regulations violate the Commerce Clause. U.S. Const. art. I, § 8, cl. 3. It argues that although Haw.Rev. Stat. § 200–6(b)(1) (Supp.1992) specifically exempts vessels engaged in interstate commerce from its anchoring and mooring regulations, the regulations promulgated pursuant to that statute do not exempt vessels in interstate commerce. In addition, it argues that it has affidavits (presented too late for the motion for summary judgment and rejected on motion for reconsideration) which establish that the Hawaiian regulations would implicate vessels engaged in interstate commerce. Even if the Hawaiian regulations actually affect vessels in interstate commerce, they do not run afoul of the Commerce Clause.

### A. *Commerce Clause Analysis*

The Supreme Court has outlined a two-tiered approach to analyzing state regulations under the Commerce Clause:

> [T]he first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it "regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce." As we use the term here, "discrimination" simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. If a restriction on commerce is discriminatory, it is virtually per se invalid. By contrast, nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

*Oregon Waste Sys. Inc. v. Department of Envtl. Quality,* — U.S. ——, ——, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994) (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979) & *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)) (citations omitted); *see also National Collegiate Athletic Ass'n v. Miller,* 10 F.3d 633, 638 (9th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1543, 128 L.Ed.2d 195 (1994).

### B. *Are the Regulations Per Se Violative of the Commerce Clause?*

*1. Direct Regulation of Commerce.* The Hawaiian legislation specifically exempts vehicles engaged in interstate or foreign commerce. Haw.Rev.Stat. § 200–6(b)(1) (Supp. 1992). The Preservation Society points out that the regulations promulgated under section 200–6 do not make similar exemptions. However, even assuming that the regulations do affect vessels engaged in interstate commerce, the effect of the regulations is not direct.

The regulations govern the anchorage and mooring privileges of all boats wishing to remain in a specific area off the coast of Hawaii for more than 72 hours. They do not target vessels in interstate commerce specifically and the purpose of the regulations is in no way related to the regulation of interstate commerce. It is true that vessels coming in from the mainland must obtain permits and moor in certain designated locations. That, however, is only an indirect effect on interstate commerce.

*2. Discrimination Against Vessels Engaging in Interstate Commerce.* The Preservation Society argues that the regulations discriminate against vessels engaging in interstate commerce because 1) the fees for vessels moored in small boat harbors are greater for nonresidents than they are for residents (Haw.Rev.Stat. § 200–10(c) (Supp. 1992); Hawaiian Administrative Rules § 19–65–7), and 2) out-of-state vessels seeking safe harbor in Hawaii are less likely to be in a position to obtain permits to moor their vessels for more than 72 hours because "the

marinas are full, the moorings are full and the waiting lists are full." (Amicus Brief, National Water Rights Association).

The disparate fees in small boat harbors do not constitute discrimination against nonresidents. We have held that such fee differentials serve the purpose of "equalizing costs attendant to maintaining and constructing small boat harbors [in that] [r]esidents have recently contributed to the state's economy through employment and state taxes, while nonresidents have not." *Hawaii Boating Ass'n v. Water Transp. Facilities Div., Dep't of Transp.,* 651 F.2d 661, 666 (9th Cir.1981) (internal quotations omitted). In addition, the Supreme Court has noted that it "perceive[s] no duty on the State to have its licensing structure parallel or identical for both residents and nonresidents, or to justify to the penny any cost differential it imposes in a purely recreational, noncommercial, nonlivelihood setting." *Baldwin v. Montana Fish and Game Comm'n,* 436 U.S. 371, 391, 98 S.Ct. 1852, 1864, 56 L.Ed.2d 354 (1978).

The Preservation Society claims that one of the late affidavits establishes that it is possible for a nonrecreational vessel carrying freight from abroad to find itself subject to the fee differential. However, the affidavit actually includes no information to that effect. The Preservation Society has offered no evidence that nonrecreational vessels might be impacted by the fee differential in small boat harbors.

The argument that the regulations are discriminatory because nonresidents are more likely to find themselves without a permit to moor their vessel is also meritless. The only discrimination effected by the regulations is against vessel owners who plan poorly and therefore do not arrange to obtain permission to moor their boat in advance from the Hawaiian authorities. This does not constitute discrimination against vessels engaging in interstate commerce.

*C. Balancing Test*

The state regulations are not per se violative of the Commerce Clause. The only effects of the Hawaiian regulations on interstate commerce are indirect. In addition, the regulations work evenhandedly. As a result, we must balance the State's interests in having the regulations against the indirect burden on interstate commerce worked by the regulations. Unless the latter outweighs the former, the regulations are not violative of the Commerce Clause. *Pike,* 397 U.S. at 142, 90 S.Ct. at 847.

The state has presented evidence showing that the conflicting uses between recreational ocean users and vessels conducting passive mooring activities pose a substantial threat to public safety because of the heavy traffic on the seaways. Thus the state has a substantial interest in the promulgation of the regulations at issue. On the other hand, there is little, if any, burden on interstate commerce. There is no commerce clause violation.

III. INTERNATIONAL TREATY

The Preservation Society argues that Hawaii's regulations violate the provisions of the Law of the Sea: Convention on the Territorial Sea and the Contiguous Zone, April 29, 1958, 15 U.S.T. 1606. The 1958 Convention is an international treaty, of which the United States is a signatory. According to the Preservation Society, the Hawaiian regulations interfere with the right of innocent passage through the territorial sea that is guaranteed to foreign flag vessels under Article 14 of the 1958 Convention. 15 U.S.T. at 1610.

The argument is unpersuasive. Assuming that the treaty applies to them (despite the fact that there is no record evidence that any of the Preservation Society's members own or operate foreign flag vessels), the Hawaiian regulations do not interfere with their "innocent passage through the territorial sea." 15 U.S.T. at 1610. The treaty expressly provides for regulations such as those promulgated by Hawaii. The treaty provides that "[f]oreign ships exercising the right of innocent passage shall comply with the laws and regulations enacted by the coastal State ..., in particular, with such laws relating to transport and navigation." 1958 Convention, art. 17, 15 U.S.T. at 1611.

In addition, innocent passage must be "continuous and expeditious." United Na-

tions Convention on the Law of the Sea 1982, art. 18 ¶ 2, December 10, 1982, U.N. Publication No. E 83.V.5, 21 I.L.M. 1261 (1982). Foreign flag vessels may only stop and anchor, in so much as doing so is "incidental to ordinary navigation or [is] rendered necessary by *force majeure* or by distress." 1958 Convention, art. 14, ¶ 3, 15 U.S.T. at 1610.

Hawaii's regulations have no effect on vessels lying at anchor, berthed or moored in any commercial harbors. Haw.Rev.Stat. § 200–5 (1993). The statute also exempts vessels engaged in foreign commerce and seeking to moor or anchor within Hawaiian ocean waters or navigable streams. Haw. Rev.Stat. § 200–6(b) (1993). However, even if it did not, the statute exempts pleasure craft and fishing vessels during the first 72 hours of anchoring, after which the vessel must move on or obtain a permit. *Id.* 72 hours is consistent with the requirement that passage be "continuous and expeditious." 1982 Convention, art. 18 ¶ 2. There is no conflict between the treaty and Hawaii's regulations.

## IV. DUTY ON TONNAGE

The Preservation Society argues that the mooring and anchoring fees collected by the state pursuant to the Hawaiian regulations are a duty on tonnage in violation of Article I, Section 10 of the U.S. Constitution. The Preservation Society acknowledges 1) that a state is not prohibited from charging reasonable fees in return for services rendered, *Clyde Mallory Lines v. Alabama,* 296 U.S. 261, 263, 56 S.Ct. 194, 195, 80 L.Ed. 215 (1935), and 2) that the nominal basis for the fees charged by Hawaii (use of rest room facilities, parking, trash disposal, and security) would be sufficient to satisfy *Clyde Mallory Lines.*

It argues, however, that the State of Hawaii does not provide the services it claims to provide and therefore the fees collected are actually a duty on tonnage. The only evidence in support of the Preservation Society's contention are affidavits that were submitted late and therefore not considered by the district court on motion for summary judgment. The district court refused to consider the affidavit on motion for rehearing.

Even if we were to consider the affidavits, no triable issue of fact is raised. The affidavits acknowledge that boaters mooring in Ke'ehi Lagoon receive use of rest room facilities, parking, trash disposal, and security from the state. They simply complain that the state facilities are public and not specific to those paying the fees. Although the general public may occasionally use the services, the affiants use the services on a regular basis. There are no questions of fact. Hawaii provides services in exchange for the mooring and anchorage fees. The fees are not a duty on tonnage. *Clyde Mallory Lines,* 296 U.S. at 263, 56 S.Ct. at 195.

## V. EQUAL PROTECTION

The Preservation Society argues that the Hawaiian regulations violate the Equal Protection Clause of the Constitution's Fourteenth Amendment. The argument is based on the fact that, in small boat harbors, nonresidents are charged higher fees than residents. The Preservation Society contends that this differential fee structure constitutes an unconstitutional infringement of a fundamental right (the right to travel). According to the Preservation Society, strict scrutiny must be applied and the fee differentials struck down.

We have already held that strict scrutiny is not applicable in the context of fee differentials in Hawaii's small boat harbors because the fee differential is not a "*significant* 'penalty' on the right to travel." *Hawaii Boating Ass'n,* 651 F.2d at 665. Thus, the Hawaiian fee differentials are examined for a rational relation to a legitimate state interest. *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976).

Fee differentials for recreational boats in small boat harbors are "rationally related to a valid legislative goal, i.e. equalizing costs attendant to maintaining and constructing small boat harbors." *Hawaii Boating Ass'n,* 651 F.2d at 666. The fee differentials do not violate the Equal Protection Clause.

The Preservation Society also argues that the very existence of mooring requirements infringes on the right to travel and therefore

violates the Fourteenth Amendment. According to the Preservation Society, all the moors are full and nonresidents travelling to Hawaii have no place to moor their boats. The argument is unpersuasive.

To infringe upon a fundamental right, the regulation must impose a penalty effecting a genuinely significant deprivation such as a denial of the basic necessities of life or the denial of a fundamental political right. *Fisher v. Reiser,* 610 F.2d 629, 639 (9th Cir.1979), *cert. denied,* 447 U.S. 930, 100 S.Ct. 3029, 65 L.Ed.2d 1124 (1980). Requiring vessels to obtain permission to moor in Hawaii is not a penalty at all. Those vessels unable to moor because they have not obtained permission sufficiently in advance of their arrival can only blame their own failure to plan ahead. No fundamental right is implicated by the mooring regulations.

## VI. PRIVILEGES AND IMMUNITIES.

The Preservation Society raises for the first time on appeal the argument that the fee differentials imposed in the small boat harbors violates the Privileges and Immunities Clause (Art. IV, Section 2). Failure to raise or brief an issue in a timely fashion constitutes waiver of the issue on appeal. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir.1991); *In re Riverside–Linden Inv. Co.,* 945 F.2d 320, 324–25 (9th Cir.1991). Even if the issue were not waived it would be fôreclosed by our ruling in *Hawaii Boating Ass'n,* 651 F.2d at 666–67 ("we hold that appellants [arguing that differential fees are unconstitutional] have not established a viable privileges and immunities claim").

## VII. CLASS CERTIFICATION

Plaintiffs defined their proposed class as "all individuals who use and are interested, or who may become interested, in the use of the navigable waters claimed by the State of Hawaii for the purpose of recreational, residential, and commercial boating and navigation." The district court declined to expand the class of plaintiffs under Rule 23(a) of the Federal Rules of Civil Procedure beyond that of all individuals affected by the regulations at Ke'ehi Lagoon. The court noted that plaintiffs' proposed class was potentially infinite. The court also noted that plaintiffs had failed to make the showings required under Rule 23(a) for certification of the expanded class.[5]

We will not overturn a district court's denial of class certification unless we find an abuse of discretion. *Johnson v. Shalala,* 2 F.3d 918, 920 (9th Cir.1993); *Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1304 (9th Cir.1990). A court abuses its discretion if it applies impermissible legal criteria. *Nelsen v. King County,* 895 F.2d 1248, 1249 (9th Cir.1990); *Hatch v. Reliance Ins. Co.,* 758 F.2d 409, 416 (9th Cir.), *cert. denied,* 474 U.S. 1021, 106 S.Ct. 571, 88 L.Ed.2d 555 (1985).

The Preservation Society's definition of their proposed class was broad. In addition, it is unclear whether there were questions of law or fact common to the class. The district court did not apply the wrong legal standard. There was no abuse of discretion.

## VIII. LEAVE TO AMEND THE COMPLAINT

The Preservation Society contends that the district court erred in denying its motion to amend its complaint. The motion to amend was filed four months after the complaint was filed and one and a half months after the defendants filed their motions for judgment on the pleadings, or in the alternative, for summary judgment. The district court denied the motion because 1) the Preservation Society did not set forth with any specificity the grounds for their motion to amend, 2) the motion presented a substantial risk of prejudice to defendants in light of the fact that six weeks had passed since the motions for summary judgment were filed,

5. The Federal Rules provide for certification of a class where:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

and 3) the amendments proposed by plaintiff would have been futile for lack of merit.

We review for an abuse of discretion the denial of leave to amend after a responsive pleading has been filed. *Cenlin Taiwan Ltd. v. Centon, Ltd.*, 5 F.3d 354, 357 (9th Cir. 1993); *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 798 (9th Cir.1991). We review such a denial strictly, however, in light of the strong policy permitting amendment. *Texaco*, 939 F.2d at 798. Based on the above analysis (which took into account the information and allegations included in the Preservation Society's proposed amendments to their pleadings) we conclude that the proposed amendments were futile and properly denied. *Cenlin Taiwan Ltd.*, 5 F.3d at 357; *Texaco*, 939 F.2d at 798.

## IX. THE PRESERVATION SOCIETY'S CIVIL RIGHTS CLAIMS

The Preservation Society argues that the district court did not consider its civil rights claims. A plaintiff's 42 U.S.C. § 1983 claims must fail if plaintiff fails to show a violation of its constitutional or statutory rights. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). We hold, *supra*, that the district court properly granted summary judgment in favor of the defendants on all of the Preservation Society's constitutional and statutory claims. The district court's summary judgment on the Preservation Society's civil rights claims was proper.

The Preservation Society's civil rights claims against the State of Hawaii were also barred by the Eleventh Amendment. Hawaii has not consented to be sued. *Papasan v. Allain*, 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986); *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). The Eleventh Amendment also immunized Hawaiian State officials sued by the Preservation Society in their official capacity for damages. *Ulaleo v. Paty*, 902 F.2d 1395, 1398 (9th Cir.1990).

## X. MOTION FOR RECONSIDERATION

The Preservation Society appeals the district court's denial of its motion for amendment of judgment, relief from judgment, or for reconsideration. The basis for the Preservation Society's motion was deposition testimony and affidavits which it argued established that there were material questions of fact remaining that militated against awarding defendants summary judgment. The district court found that no other basis for the motions existed because no changes in the law were referenced and no additional cases were cited. The district court also found that the depositions and affidavits attached to the Preservation Society's motions could have been produced prior to the February 22, 1993 hearing on the motion for summary judgment.

Motions for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b) are addressed to the sound discretion of the district court. Reversal requires some abuse of discretion. *Northern Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886, 889 (9th Cir.1992). In addition, a denial of a motion for reconsideration under Federal Rule of Civil Procedure 59(e) is construed as one denying relief under Rule 60(b) and will not be reversed in the absence of an abuse of discretion. *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1441 (9th Cir. 1991). A decision regarding a motion to amend the judgment is also reviewable for abuse of discretion. *Floyd v. Laws*, 929 F.2d 1390, 1400 (9th Cir.1991).

The late dates on which the depositions were taken (January 25 and 26, 1993) and the fact that the Preservation Society offers no reason why the affidavits could not have been obtained prior to the day on which the summary judgment hearing was held precludes a finding that the district court abused its discretion in denying the motions. *Engelhard Indus., Inc. v. Research Instrumental Corp.*, 324 F.2d 347, 352 (9th Cir.1963), *cert. denied*, 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed.2d 215 (1964).

## BARBER'S APPEAL

## I. ARTICLE IV, SECTION 4

Barber argues that the United States and the State of Hawaii have permitted the economic invasion of the State of Hawaii by Japan. He claims that permitting

the Japanese to colonize Hawaii is a violation of Article IV, Section 4, which states:

> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion.

It is not clear whether Barber raised this issue before the district court. However, assuming Barber has not waived the issue, it is dismissed as a nonjusticiable political question. *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962); *Luther v. Borden,* 48 U.S. (7 How.) 1, 38–39, 12 L.Ed. 581 (1849).

## II. IMPROPER COLLABORATION

Barber alleges that the Coast Guard improperly entered into a "Federal/State Cooperative Agreement" that he claims had the purpose of permitting the economic invasion of Hawaii. The record shows that the purpose of the Agreement entered into by the Coast Guard with the State of Hawaii was to promote "boating safety programs." Congress has authorized the Coast Guard, through the Department of Transportation, to "advise, assist and cooperate with the states . . . in planning, developing and carrying out boating safety programs" and to make "agreements and other arrangements with states when possible." 46 U.S.C. § 13109 (the "Federal Boat Safety Act of 1971"). The Agreement was not improper.

## III. TAKINGS CLAUSE

Barber claims that his property has been taken without just compensation, in violation of the Fifth and Fourteenth Amendments. The mooring and anchoring regulations do not constitute takings of private property. At most, the value of Barber's property has been diminished. *Lucas v. South Carolina Coastal Council,* —— U.S. ——, ——, 112 S.Ct. 2886, 2992–93, 120 L.Ed.2d 798 (1992).

## IV. MOTION TO STAY ENFORCEMENT

Barber's motion to stay enforcement of Hawaii's mooring and anchorage regulations was properly denied. His action has no possibility of success on the merits. *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.,* 856 F.2d 1445, 1449 (9th Cir.1988).

AFFIRMED.